RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant/Cross-Appellee*,

                                                          Nos. 11-4327/4391
          *v.*

MICHAEL E. PEPPEL,
          *Defendant-Appellee/Cross-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:06-cr-196—Sandra S. Beckwith, District Judge.

Argued: December 5, 2012

Decided and Filed:  February 15, 2013

Before:  MOORE, GILMAN, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

_____

**ARGUED:** Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellant/Cross-Appellee.  John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER, LLP, Cincinnati, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellant/Cross-Appellee.  John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER, LLP, Cincinnati, Ohio, for Appellee/Cross-Appellant.

_____

### OPINION

_____

      KAREN NELSON MOORE, Circuit Judge.  Defendant-Appellee Michael Peppel, former President, CEO, and Chairman of the Board of Directors of MCSi, Inc. ("MCSi"), conspired with CFO Ira Stanley to falsify MCSi accounting records and financial statements in order to conceal the actual earnings from shareholders, while at the same time laundering proceeds from the sale of his own shares in a public stock

1

offering. For this conduct, the sentencing guidelines provided a sentencing range of 97–121 months' imprisonment. The district court, based almost solely on its estimation of Peppel as "a remarkably good man," varied downward drastically from this advisory range, imposing a custodial sentence of only seven days—a 99.9975% reduction. R. 224 (Sentencing Tr. at 86:10) (Page ID #2433). Plaintiff-Appellant the government appeals the substantive reasonableness of the seven-day sentence, arguing that a seven-day sentence does not adequately reflect the seriousness of the offense, serve the goal of general deterrence, or avoid national sentencing disparities, and that the district court placed disproportionate weight on disfavored factors. Peppel contests the government's arguments and proffers a conditional cross-appeal, contending that the district court erred in its amount-of-loss and number-of-victims calculations that formed the basis of two sentencing enhancements.

We conclude that the district court abused its discretion by imposing an unreasonably low seven-day sentence, but did not err in calculating the amount of loss or number of victims. We therefore **VACATE** Peppel's sentence and **REMAND** for resentencing consistent with this opinion.

## I. BACKGROUND

From 1996 to March 2003, Peppel was employed at MCSi, a publicly traded company specializing in computer technology and visual-communication products. Presentence Report ("PSR") ¶¶ 43, 53. In 1998, Peppel was elected President and CEO of MCSi and was subsequently elected as Chairman of the Board of Directors in 2000. *Id.* ¶ 53. After success in the late 1990s, MCSi began experiencing financial difficulties. *See id.* ¶¶ 45, 58. In 2000, Peppel and MCSi CFO Ira Stanley conspired to falsify MCSi accounting records and financial statements in order to conceal the actual earnings from shareholders. R. 180 (Statement of Facts at 1) (Page ID #1707). This conspiracy, to which Peppel pleaded guilty, ended on or about April 30, 2003. *Id.* These falsified records "were based upon fraudulent MCSi transactions involving a firm known as Mercatum, Ltd." *Id.* Although the specifics of these transactions are debated, it appears that in December 2001 Peppel set up a sale of $37.1 million of MCSi product to

Mercatum under terms that allowed Mercatum to pay for the MCSi product upon resale. PSR ¶¶ 88–91. Peppel then arranged, through false documents, to record this sale as a "bill and hold," which indicated that Mercatum was billed prior to receipt of the goods. *Id.* ¶¶ 91–93. MCSi therefore was able falsely to report $37.1 million in revenue in connection with this purported sale in the fourth quarter of 2001. *Id.* ¶ 99. These false revenues were included in a February 26, 2002 public announcement. Govt. App. at 74 (Dayton Business Journal Article). This scheme also included additional sham transactions involving FedEx, Skytron, and ClearOne Communications. PSR ¶¶ 56–85, 100–107.

During the same time period that he was orchestrating the Mercatum transaction, Peppel sold 300,000 shares of his personal MCSi stock in a public stock offering. PSR ¶¶ 113–114. In this December 21, 2001 transaction, "Peppel generated gross proceeds before commission and expenses in the amount of $6,862,500." *Id.* Peppel then deposited these proceeds into personal bank accounts, and these transactions formed the factual basis of the money-laundering count to which Peppel pleaded guilty. *Id.*

In January 2003, several class actions were filed against Peppel and MCSi, alleging various forms of fraudulent conduct. Peppel App. Ex. G at 66 (Harrison Compl.); Peppel App. Ex. H at 89–90 (Dayton Business Journal Articles). On February 14, 2003, MCSi announced in a press release that the SEC had commenced an investigation, and on February 18, 2003, the first day of trading following the announcement, MCSi stock fell $0.87 per share. Peppel App. Ex. E at 63 (Press Release); PSR ¶¶ 124–26. Peppel was terminated from MCSi on March 11, 2003, and MCSi was de-listed from NASDAQ on April 17, 2003. PSR ¶¶ 122–126. An SEC civil-enforcement action followed, and certain restrictions were instituted against Peppel, including a lifetime bar from serving as an officer or director of a public company. R. 224 (Sentencing Tr. at 8:7–20) (Page ID #2355).

On December 13, 2006, the government filed a twenty-six count indictment against Peppel. PSR ¶ 1. On August 11, 2010, Peppel pleaded guilty to conspiracy to commit securities, mail, and wire fraud in violation of 18 U.S.C. §§ 371 and 1349;

willful false certification of a financial report by a corporate officer in violation of 18 U.S.C. § 1350; and money laundering in violation of 18 U.S.C. § 1957. R. 179 (Plea Agreement at ¶ 1) (Page ID #1693). The parties stipulated to use of the Sentencing Guidelines Manual dated November 1, 2002. R. 179 (Plea Agreement at ¶ 5) (Page ID #1695).

Because of the numerous objections to the PSR, the district court held an evidentiary hearing; in particular, the district court focused on calculating the amount of loss caused by Peppel's conduct. At the evidentiary hearing, the district court heard testimony and received reports on five competing amount-of-loss theories. The first was proffered by the probation officer, who recommended attributing a loss of $18 million to Peppel as a result of his conduct. To reach this number, the probation officer calculated the loss per share from February 14 to February 18, 2003, and multiplied this number ($0.87) by the number of publicly held shares (approximately 21 million). R. 206 (Order at 2) (Page ID #2201). The government put forth three amount-of-loss calculations. The first, which was calculated by John Hlavacek, the SEC expert, estimated the total loss to be $298 million. *Id.* "This was based on the average weekly market price of MCSi stock from May 14, 2001 to November 14, 2002 ($13.59), less the closing price on February 18, 2003 ($1.25), times the total shares held by non-insiders (24,158,776)." *Id.* The government then called Dr. Marlena Akhbari, who "generally opined that public disclosure of four separate pieces of adverse information about MCSi from January 15 to February 14, 2003, caused a decline in value of $2.91 per share." *Id.* at 3 (Page ID #2202). Additionally, Joseph Geraghty testified for the government and "opined that Peppel's fraud with respect to the Mercatum transaction caused an actual loss to MCSi's secured lenders of approximately $88 million." *Id.*

Peppel, however, continued to argue that "shareholder loss simply cannot be reasonably calculated, and that at best, the Court should utilize his gain from the sale of MCSi stock in December 2001 during the public offering," valued at $6,862,500. *Id.* Ultimately, the district court applied the probation officer's calculation, which resulted in a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K) and a 4-level

enhancement under U.S.S.G. § 2B1.1(b)(2)(B). *Id.* at 35–36 (Page ID #2234–35). These enhancements, in conjunction with other factors not at issue in this appeal, resulted in an adjusted offense level of 30 and an advisory sentencing range of 97–121 months' imprisonment. *Id.*

The district court held an extensive sentencing hearing, at which Peppel called numerous witnesses to testify as to his character, accomplishments, and charitable works. Peppel argued for a sentence of probation and supervised release, whereas the government maintained that a within-guidelines sentence would be appropriate. R. 224 (Sentencing Tr. at 7:23–25, 70:1–4) (Page ID #2354, 2417). The district court imposed a seven-day custodial sentence, three years of supervised release, and a $5 million fine. *Id.* at 96:18–97:24 (Page ID #2443–44).

## II.  STANDARD OF REVIEW

At issue is whether the government's failure to raise certain of its arguments at the time of the sentencing hearing requires us to review the substantive reasonableness of the sentence for plain error or for an abuse of discretion. The government argues that because it appeals the substantive reasonableness of the sentence, it had no duty to object at the time of the sentencing hearing, and therefore, abuse-of-discretion review applies. Appellant Br. at 35; Appellant Reply Br. at 1. Peppel rejoins that plain-error review applies because the government not only failed to object to the length of the sentence, but also declined "to present any substantial argument on the 3553(a) factors and, indeed, flatly told the trial court that it was choosing not to." Appellee Br. at 29.

"A litigant has no duty to object to the 'reasonableness' of the length of a sentence . . . *during* a sentencing hearing, just a duty to explain the grounds for leniency. That is because reasonableness is the standard of *appellate* review, not the standard a district court uses in imposing a sentence." *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc) (emphasis in original); *see also United States v. Freeman*, 640 F.3d 180, 185 (6th Cir. 2011) ("Substantive-reasonableness claims do not need to be raised before the district court to be preserved for appeal."); *United States v. Massey*, 663 F.3d 852, 857 (6th Cir. 2011) ("Unlike objections to the procedural reasonableness

of a sentence, the defendant need not object to the substantive reasonableness of a sentence in the district court in order to preserve the issue for appeal."). "As a general matter, we review sentences for an abuse of discretion." *Massey*, 663 F.3d at 856.

In certain circumstances, we have applied plain-error review when evaluating a substantive-reasonableness challenge. *See, e.g.*, *United States v. Stall*, 581 F.3d 276, 283 (6th Cir. 2009). However, we have limited the application of plain-error review to situations in which the failure to raise arguments below is flagrant, and the challenged sentence is "attributable in significant part to the failure of prosecutors to defend their sentencing recommendations vigorously." *United States v. Bistline*, 665 F.3d 758, 768 (6th Cir. 2012) (internal quotation marks omitted). In other words, these cases are "more a cautionary tale about prosecutorial neglect" where the prosecution essentially presents no evidence and makes no arguments concerning the recommended sentence. *Id.* Plain-error review does not apply to the circumstances of the present case where the government has simply failed to raise below an argument regarding the reasonableness of the length of the sentence. *See Vonner*, 516 F.3d at 389 ("Plain-error review, as an initial matter, does not apply to either argument [regarding the length of the sentence or the presumption of reasonableness], even though the court asked Vonner's counsel at sentencing whether he had any objections not previously raised and even though counsel did not mention these two arguments.").

Peppel argues that the government's anemic response to his sentencing memorandum constitutes the type of prosecutorial neglect warranting our review of the district court's sentence for plain error. Although the government's two-page response was cursory and contained significant omissions, the government argued extensively for a within-guidelines sentence at the sentencing hearing, where it raised all but one of the arguments that it now presents on appeal—the only omission being the need to avoid national sentencing disparities. R. 217 (Gov't Response) (Page #2295) (focusing on rebutting claims that Peppel had changed his lifestyle and that he is the caretaker for several of his family members); R. 224 (Sentencing Tr. at 65:24–66:2) (Page ID #2412–13) ("To a great extent, Your Honor, these personal characteristics that we have

heard so much about sitting here in this courtroom for the last hour and a half, while they're interesting, are largely irrelevant to your task ahead."); *id.* at 67:24–68:4 (Page ID #2414–15) ("We punish criminals, first and foremost, to see if we can rehabilitate them. If we can separate him from society, give him an opportunity to fully appreciate the criminality of his actions, so hopefully he will conclude that his actions were more than just merely regrettable."); *id.* at 68:23–69:9 (Page ID #2415–16) ("And we also impose punishment on criminals for deterrence. . . . What punishment is this Court going to hand down so that those other Michael Peppels out there . . . are going to sit up and take notice of, that these rules, these laws, are serious and they need to be obeyed and, if they're broken, punishment will be meted out?").[1] As explained above, this failure to raise one argument at sentencing—the need to avoid national sentencing disparities—does not transform the comprehensive substantive-reasonableness challenge into a new argument relegated to plain-error review. We will therefore apply the abuse-of-discretion standard in evaluating the substantive reasonableness of the district court's sentence.

## III. SUBSTANTIVE REASONABLENESS

The government argues that Peppel's sentence is substantively unreasonable in light of the 18 U.S.C. § 3553(a) factors and the advisory 97-month minimum sentence under the guidelines. Appellant Br. at 31. The government offers the following five bases for this contention:

> [The sentence] (1) fails to adequately reflect the seriousness of Peppel's offense conduct, promote respect for the law, and provide just punishment for the offense; (2) fails to afford adequate general deterrence to similar offense conduct; (3) fails to adequately avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; (4) is based, in part, on an unreasonable amount of weight given to Peppel's history and

---

[1] Additionally, the district court conducted a two-day evidentiary hearing solely on the disputed issues regarding the application of the Sentencing Guidelines during which the government produced significant evidence, expert testimony, and argument in support of its position that an amount-of-loss enhancement should be applied to Peppel. R. 206 (Order) (Page ID #2200).

characteristics; and (5) is based, in part, on the consideration of impermissible factors.

*Id.* at 37.  Peppel counters each reason separately and also argues that the district court correctly considered the totality of the factors and selected a sentence that is sufficient on the whole.  Appellee Br. at 29–31.

"A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor."  *United States v. Robinson*, 669 F.3d 767, 774 (6th Cir. 2012) (internal quotation marks omitted).  "The applicable Guidelines range represents the starting point for substantive-reasonableness review because it is one of the § 3553(a) factors and because the Guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors."  *United States v. Haj-Hamed*, 549 F.3d 1020, 1025 (6th Cir. 2008).  "While the standard of review does not change based on whether a sentence is inside, just outside, or significantly outside the Guidelines range, the greater the district court's variance, the more compelling the evidence must be."  *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010).

## A.  Seriousness of the Conduct, Respect for the Law, and Just Punishment

The government argues that the district court committed error "by failing to explain how Peppel's sentence of only seven days in jail, a 97-month downward variance, satisfies the § 3553(a) goals of adequately reflecting the seriousness of Peppel's offense conduct, of promoting respect for the law, and of providing just punishment for Peppel's conduct."[2]  Appellant Br. at 40.  Peppel rejoins that the district court considered the seriousness of the offense and that the government's argument ignores the non-custodial components of Peppel's sentence, the totality of which reflects the seriousness of the offense.  Appellee Br. at 41–49.

---

[2]This principle derives from 18 U.S.C. § 3553(a)(2)(A), which provides that the sentencing court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

We have previously asserted that a district court must explain how a sentence comports with the level of seriousness of the crime committed: "While the district court recognized that the offenses of conviction were 'serious,' it did not explain how the one-day sentence it gave Davis meshed with Congress's own view of the crimes' seriousness . . . ." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (internal citations omitted). It is plain that the district court acknowledged the seriousness of the offense in broad terms at Peppel's sentencing hearing. R. 224 (Sentencing Tr. at 87:1–3) (Page ID #2434) ("There's no doubt that manipulating financial statements of a publicly traded company is a serious offense and one that must be punished."); *see also id.* at 87:11–13 ("Promoting respect for the law is another factor the Court must consider in imposing [a] sentence."). Notably, however, the district court never explained why the seven-day sentence was sufficient to reflect the seriousness of Peppel's crimes. The most applicable statement made by the district court to this analysis was its reasoning that a double-digit sentence would be greater than necessary given the facts of this case. *Id.* at 90:18–24 (Page ID #2437) ("While the Court [in *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008),] noted that there is undoubtedly a host of factors that entered into these sentences, it was plain to the Court that the defendants were not in the same league with offenders who directly caused enormous losses and received lengthy double-digit sentences. In the latter category, the primary defendants in Enron, WorldCom, and Global Crossing cases were particularly mentioned."). However, reasoning that a twenty-five-year sentence is inappropriate in light of the facts of the case does not satisfy the requirement to state affirmatively why the chosen sentence reflects the seriousness of the offense.

Peppel responds that the totality of his sentence adequately reflects the seriousness of the offense. Peppel notes that in addition to the seven-day custodial sentence, he "has forfeited substantial personal assets, . . . the SEC has barred [him] from ever again serving as a director or officer of a public company," and the district court imposed a $5 million fine. Appellee Br. at 47. The government rejoins that custodial sentences are qualitatively different and reiterates its argument that the district court

failed to explain how the totality of these components is sufficient to reflect the seriousness of the conduct. Appellant Reply Br. at 17–20.

The existence of additional components of Peppel's sentence does not cure the district court's failure to explain how a seven-day custodial sentence adequately reflects the seriousness of the offense. Moreover, as argued by the government, many of the statements made by the district court in this portion of its analysis are improper under our established law.[3] For example, the district court considered collateral consequences of the prosecution and conviction: "The Court accepts Mr. Peppel and his family's representation that the last five years have been punishing, literally and figuratively, for Mr. Peppel, and the Court takes that into consideration as well." R. 224 (Sentencing Tr. at 94:1–5) (Page ID #2441); *see also id.* at 98:22–23 (Page ID #2445) (noting that the seven-day sentence "will punish the defendant, who has also suffered"). Such assertions are in direct contradiction of *Bistline*, where we explained that

> [t]he district court's recitation of these collateral consequences therefore does nothing to show that Bistline's sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.

665 F.3d at 765–66.

Peppel further argues that there is consensus among judges, academics, the American Bar Association, and the Department of Justice that the guidelines for white-collar crimes are flawed and require amendment. Appellee Br. at 44–45. In support of his argument, Peppel relies on a letter from the Director of the Office of Policy and Legislation. Letter from Jonathan J. Wroblewski, Director, Office of Policy and Legislation, to the Honorable William K. Sessions III (June 28, 2010), *available at* http://sentencing.typepad.com/files/annual_letter_2010_final_062810.pdf.

---

[3]The government raises this as a separate objection, but we will consider it in conjunction with the seriousness of the offense, given the significant factual overlap.

The substance of this letter, however, undermines Peppel's argument not only with respect to the seriousness of the offense, but also regarding nearly every other sentencing factor at issue. The letter focuses on the sentencing disparity between certain classes of crimes, noting that a different regime exists for certain frauds "that has largely lost its moorings to the sentencing guidelines." *Id.* at 2. Regarding economic crimes specifically, Mr. Wroblewski writes that "[u]nfortunately, we have seen with increasing frequency district courts sentencing fraud offenders—especially high-loss fraud offenders—inconsistently and without regard to the federal sentencing guidelines." *Id.* at 4. He further opines that "[t]he current sentencing outcomes in these cases are unacceptable, and the Commission should determine whether some reforms are needed." *Id.* at 5.

For these reasons, we find Peppel's arguments unpersuasive and conclude that the district court abused its discretion by failing to explain why a seven-day sentence of imprisonment adequately reflects the seriousness of Peppel's offense and that the court erred by considering impermissible factors.

## B. General Deterrence

The government also argues that the seven-day sentence does not effectuate § 3553(a)'s goal of general deterrence. Appellant Br. at 42. Peppel counters that the negative publicity garnered from the proceedings would deter an executive from following in his footsteps and that a custodial sentence would not add to general deterrence. Appellee Br. at 49–52. The district court stated the following concerning general deterrence:

> And with regard to general deterrence, several jurists and commentators have concluded that relatively short sentences of incarceration for white collar economic crimes are generally more than sufficient to serve this goal. And I would refer counsel to the case of *United States versus Adelson*, which can be found at 441 F. Supp. 2d 506, particularly pages 514 to 515. That is a Southern District of New York 2006 case, and that case cites numerous authorities for that proposition.

R. 224 (Sentencing Tr. at 88:14–21) (Page ID #2435).

As an initial matter, the district court based its ruling on an out-of-circuit case that relies upon a theory that we have expressly rejected.  In *Davis*, we reversed a district court that imposed a one-day sentence for bank fraud, explaining that "[w]hile the district court indicated that this sentence would serve the goals of societal deterrence, . . . it is hard to see how a one-day sentence for a lucrative business crime satisfies that goal." 537 F.3d at 617 (internal citation omitted).  In reaching this conclusion, we cited with approval an Eleventh Circuit case which reasons that "[t]he 7-day sentence imposed by the district court also utterly fails to afford adequate deterrence to criminal conduct. Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks, alteration, and citation omitted).  The Eleventh Circuit further concludes:  "Yet the message of Martin's 7-day sentence is that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty. . . . The district court's 7-day sentence not only fails to serve the purposes of § 3553, but even worse, undermines those purposes." *Id.*

Moreover, the sentence imposed by the district court in this case bears little resemblance to that imposed by the district court in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), as is made clear when the principle cited by the district court is placed in context.  To begin, the potential sentence for Adelson under the guidelines was eighty-five years, which is significantly greater than the eight-to-ten-year sentence advised for Peppel. *Adelson*, 441 F. Supp. 2d at 507.  In *Adelson*, the government recommended a sentence in the range of fifteen to thirty years, the defendant proposed a sentence of two years, and the district court ultimately imposed a three-and-a-half year sentence. *Id.*  The district court noted that the factor that drove the government's recommendation was the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss." *Id.* at 509.  Even after taking that factor into account, though, the district court noted the

importance of considering general deterrence in financial-fraud cases and imposed a three-and-a-half-year sentence: "notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence." *Id.* at 514. *Adelson* thus advocates implementing a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id.* at 513.

A seven-day custodial sentence does not adequately serve the goal of general deterrence, particularly in light of our binding precedent. The district court's imposition of a seven-day sentence and its assertion that such a sentence would effectuate general deterrence was thus an abuse of discretion.

## C. National Sentencing Disparities

Further, the government contends that Peppel's sentence does not avoid "unwarranted disparity with other defendants whose fraudulent conduct results in similar dollar losses to multiple victims and similar personal enrichment for the defendant." Appellant Br. at 54. Peppel argues that such a low sentence is not unusual in the white-collar-crime context and that it was appropriate to consider the sentence of Stanley, Peppel's codefendant, in imposing Peppel's sentence.[4] Appellee Br. at 53–59.

Section 3553(a)(6) provides that a sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). We have previously held that this provision refers to national sentencing disparities rather than sentencing disparities among codefendants. *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007). "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *Davis*, 537 F.3d at 617.

---

[4] An objection to an improper comparison with a codefendant is not considered an objection under § 3553(a)(6). Rather, it is an objection that the district court did not consider a discretionary factor. *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007). Because the government does not object to the comparison with Stanley, we do not address it.

The district court addresses the national-sentencing-disparities factor as follows:

> The Court must also consider avoiding unwarranted sentencing disparities among similarly situated defendants. And this is a broad consideration that goes beyond any co-defendant in this case or in this set of circumstances.

> Mr. Peppel has argued that a within Guideline sentence would be unduly harsh when compared with sentences imposed on other corporate criminals. Clearly, the aim of this statutory directive is to avoid sentencing disparities on a national basis, and the advisory Guidelines serve as a basis for avoiding such disparities. In cases where the ultimate sentence lies outside of the Guidelines range, it is difficult to assess disparity without some consideration of other similarly situated defendants.

> . . . [T]he Court nevertheless feels that and believes that specific knowledge of the myriad of facts that resulted in the particular sentences to which we are attempting to compare Mr. Peppel's situation is probably not very productive. The amount of loss, however calculated, is not the critical point, not always the critical point, and so I think other cases, specific cases, are not helpful.

> . . .

> While the Court [in *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008),] noted that there is undoubtedly a host of factors that entered into these sentences, it was plain to the Court that the defendants were not in the same league with offenders who directly caused enormous losses and received lengthy double-digit sentences [(in terms of years)]. In the latter category, the primary defendants in Enron, WorldCom, and Global Crossing cases were particularly mentioned.

> In this case the Court agrees that a double-digit sentence would be greater than necessary and likely would contribute to perceived sentencing disparity in the broad sense. The Court's estimate of actual loss in this case of approximately $18 million is not and cannot be exact for the reasons discussed in the Court's prior order.

> Mr. Peppel's admitted conduct of improperly reporting the Mercatum income and certifying MCSi's Form 10-Q is not comparable to the conduct that led to lengthy sentences for, among others, Enron and WorldCom officers. Cases involving outright theft of company or investor funds or looting company resources to enrich oneself obviously calls for much harsher sentences than this case merits.

R. 224 (Sentencing Tr. at 88:22–89:17, 90:18–91:12) (Page ID #2435–38).

As with its discussion of *Adelson*, we disagree with the district court's portrayal of *Parris*. In *Parris*, the defendants faced an advisory sentence of 360 months to life imprisonment under the guidelines. 573 F. Supp. 2d at 745. Finding this to be extreme under the circumstances, the district court asked the government and the defendants to provide the court with a compendium of factually analogous cases nationally. *Id.* at 751–52. The result of this collaborative effort was a finding that on the whole, "[t]hose who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. After considering this factor, along with the other § 3553(a) factors, the district court sentenced the defendants to sixty months of incarceration. Although this is a significant variance from the guideline range, it is a substantially greater term than a sentence of seven days. Moreover, a review of the compendium attached to the *Parris* case establishes that the sentences imposed nationally were all in terms of months or years, with the exception of one case where the defendant was imprisoned for thirty days. *Id.* at 756–62. *Parris*, if anything, establishes the opposite of what was attributed to it by the district court. The compendium makes clear that a seven-day sentence does nothing to avoid national sentencing disparities.

In addition to relying on inapposite cases, the district court failed to offer an explanation as to how a seven-day sentence avoids national sentencing disparities, an omission of even greater import when imposing a sentence so decidedly below the guideline range. By referencing the guidelines, "we do not mean to imply that only a sentence in or around that range will avoid disparities with other similar defendants. But we do not see how the sentence imposed here avoids them." *Robinson*, 669 F.3d at 777 (internal quotation marks and alteration omitted). As discussed with respect to the seriousness of the offense, the rejection of a twenty-five-year sentence does not demonstrate how the chosen sentence avoids national sentencing disparities. We therefore conclude that the district court abused its discretion in imposing a sentence that does not avoid national sentencing disparities.

**D. History and Characteristics**

Additionally, the government asserts that the district court gave undue weight to Peppel's personal history and characteristics, particularly with respect to factors discouraged by the guidelines such as education and vocational skills, family ties and responsibilities, and civic, charitable, or prior good works. Appellant Br. at 55. Peppel responds that the district court was within its discretion to consider these factors and that it engaged in a thorough analysis of each of the cited characteristics. Appellee Br. at 59–65.

The district court relied extensively on Peppel's history and characteristics in fashioning the seven-day sentence, focusing on two characteristics in particular: (1) the monetary, emotional, and charitable support Peppel provides to his family, friends, and community, and (2) his business expertise. Examples of the court's statements concerning the first characteristic are as follows:

> Mr. Peppel's sentencing memorandum and the many letters, in excess of 100, that the Court has received from friends and business acquaintances note Mr. Peppel's humble beginnings and his many community and charitable activities both before and after the charges in this case. Mr. Peppel has five dependent children and provides financial and emotional support to his brother, who is stricken with multiple sclerosis and has suffered from that disease for many years. To his credit, Mr. Peppel is now involved in a business venture that is apparently a growing success and provides a very much needed service to a large number of people, not to mention jobs.
>
> . . .
>
> Mr. Peppel is key to the welfare of his mother and brother, his wife and children, a company that depends on him in a difficult economic situation, and the Court is satisfied, as I previously stated, that Mr. Peppel will not engage in this type of behavior again.

R. 224 (Sentencing Tr. 85:15–25, 94:6–16) (Page ID #2432, 2441). With respect to the second characteristic, the court reasoned:

> Mr. Peppel is a talented businessman, entrepreneur, and the Court considers imposing a substantial fine upon Mr. Peppel, and a significant, actually maximum under the law, period of supervised release, but the

> Court sees very little benefit to be gained by incarcerating Mr. Peppel for an extended period of time as the Guidelines suggest.
>
> . . .
>
> "I see it to be wasteful for the government to spend taxpayers' money to incarcerate someone that has the ability to create so much more for this country and economy."

*Id.* at 94:6–16, 96:1–4 (Page ID #2441, 2443) (quoting Letter from Larry Liebers).

Although we have recognized that in certain instances a district court may weigh heavily factors such as financial and emotional support when considering the appropriate sentence, we cannot agree that the circumstances identified by the district court justify varying downward in such a significant manner. In *Bistline*, we similarly concluded that the district court had afforded too much weight to Bistline's "age, his otherwise unblemished record as a productive citizen, his health, and his family circumstances, specifically, the need for his assistance to care for his wife." 665 F.3d at 767 (internal quotation marks omitted). We reasoned that "[a]lthough the district court was entitled to consider these circumstances, they cannot justify the sentence imposed here." *Id.* Based on the record in this case, there is nothing to indicate that the support provided by Peppel to his family, friends, business associates, and community is in any way unique or more substantial than any other defendant who faces a custodial sentence. Further, Peppel's status in the community and chosen profession cannot alone be the basis for such a conclusion. *See id.* at 766 ("And we do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.") (internal quotation marks omitted).

The second characteristic—Peppel's business expertise—is troubling for related reasons. We reject the inference drawn from the district court's statements, and infused in Peppel's defense, that individuals with certain professional qualifications, such as Peppel, should be sentenced lightly on the asserted ground that they offer more to society than those who do not possess such knowledge and skill. To that end, the district court seems to reason, society receives a greater value from allowing individuals such as Peppel to continue to work in their chosen field than from imposing a custodial

sentence on them.  In *Christman*, we disavowed such a rationale, reasoning that "[w]hile it is not an abuse of discretion for a judge to take note of a defendant's educational background and skill, neither is a defendant's job, in and of itself, relevant to sentencing absent unusual circumstances."  607 F.3d at 1119 (internal citation omitted); *see also United States v. Pool*, 474 F.3d 1127, 1129 (8th Cir. 2007) ("Notwithstanding, it is not extraordinary that in the area of white collar crime, a principal's business and employees may suffer if he is incarcerated.").

The district court's heavy reliance on unremarkable aspects of Peppel's characteristics constituted an abuse of discretion.  Nothing in the record establishes unique circumstances other than his chosen profession and status in the community, both of which are decidedly inappropriate to form the basis of such a large downward variance.  Because the district court not only placed far too great of an emphasis on Peppel's history and characteristics, but also considered improper factors that we have previously repudiated, we conclude that the district court abused its discretion.

**E. Conclusion**

For the reasons stated, the district court abused its discretion by imposing a sentence that does not reflect the seriousness of the offense, avoid national sentencing disparities, or effectuate general deterrence, and by affording too much weight to Peppel's history and characteristics.  We therefore vacate Peppel's sentence and remand for resentencing.

## IV.  AMOUNT-OF-LOSS CALCULATION

We now turn to Peppel's conditional cross-appeal of the district court's guidelines application with respect to two enhancements:  U.S.S.G. §§ 2B1.1(b)(1)(K) and 2B1.1(b)(2)(B).  Appellee Br. at 71.  These enhancements address the amount of loss attributed to Peppel and the number of victims who sustained that loss.  We will address each issue separately.

### A.  Section 2B1.1(b)(1)(K) Enhancement:  Amount of Loss

#### 1.  Causation

Peppel argues that the government failed to meet its burden of demonstrating a causal link between the amount of loss attributed to Peppel and the conduct to which Peppel pled guilty and that the district court failed to address causation in its order.[5] Specifically, he argues that "[t]he central problem with the trial court's analysis of loss below was the lack of a causal link between the announcement of the SEC investigation—which prompted the 87¢ decline that the Trial Court found—and the conduct of Mr. Peppel that was the subject of the superseding indictment." Appellee Br. at 72.  Peppel further challenges the district court's conclusion that sufficient information regarding the SEC investigation of Peppel was available to the general public at the time of the $0.87 loss such that the loss is attributable to Peppel's conduct: "in the absence of a curative disclosure of the false information to the market *and* a market reaction to that disclosure, no causal link can be established between a securities fraud involving a publicly traded stock and investor loss." *Id.* at 78.  The government rejoins that "[t]he investing public was entitled to process the information contained in that February 14, 2003 announcement in the context of other information then available to the investing public . . . . Disclosure of all of the details of Peppel's fraudulent conduct in the announcement was not required for the investing public to reasonably react to the announcement." Appellant Reply Br. at 27–28.

A review of the district court's order reveals that the district court recognized the significance of the causation requirement to the amount-of-loss calculation and addressed it sufficiently, despite Peppel's contention otherwise. *See* R. 206 (Order at 12-13) (Page ID #2211–12) ("This Court finds that *Berger* is persuasive in distinguishing between the basic requirements of proof needed to establish the element of loss causation in a civil securities action, and the task of arriving at a reasonable estimate of actual loss

---

[5]On the issue of causation, Peppel does not contest the findings of fact or calculations made by the district court.  Appellee Br. at 72 n.13.  Therefore, we accept the amount of loss as $18,557,284, calculated by attributing a loss of $0.87 per share for 21,330,212 shares.

under Guidelines Section 2B1.1. The Court recognizes that the amount of loss is likely the single most important determinant in calculating the advisory Guidelines sentencing range in this case."). The court devoted sixteen pages to an in-depth analysis of the causation requirement, first addressing Peppel's proposed standards of proof and then turning to each of the proffered amount-of-loss calculations, focusing primarily on the sufficiency of the causal link, prior to rendering its final determination. *Id.* at 5–21 (Page ID #2204–20); *see, e.g.*, *id.* at 14 (Page ID #2213) ("In particular, the Court concludes that using the average weekly share price from May 14, 2001 to November 14, 2002 and then comparing that price with the price on a single day would result in an overstatement of loss caused by the fraudulent scheme.").

Express references are not the only means by which the district court considered causation. In fact, these principles are implicit in many of the court's statements; for example, the district court acknowledged that "[c]omparing the share price difference over the one-day trading window identified in the pre-sentence report adequately excludes from the loss calculation the tangle of market forces that Peppel contends affected MCSi's stock price." *Id.* at 21 (Page ID #2220). The court was also careful to eliminate any other causes of the loss to the extent it is possible in a fraud-on-the-market scenario:

> But the approach utilized by the pre-sentence report eliminates as much as possible the price effects of all of these other factors. MCSi's closing price on February 14, 2003[,] reflects all of that market information, as the efficient market theory assumes. The closing price on the next trading day isolates the market's response to and the price effect of the SEC announcement. The volume of shares traded on February 18 jumped precipitously (almost a ten-fold increase) from the prior day's volume, which the Court finds is further evidence of high investor concern about the announcement and its potential ramifications.

*Id.* at 22 (Page ID #2221). Finally, the court considered the information available to the public at the time of the loss. Recognizing that the announcement of the SEC investigation lacked details as to the fraudulent conduct and the contours of the investigation, the court reasoned as follows:

> Peppel is correct that there is no evidence that the fraudulent conduct alleged in the superceding indictment, including the Mercatum transaction, was **specifically** revealed to the public before February 18, 2003. He argues that civil securities fraud plaintiffs must generally establish that the alleged fraud was disclosed to the market and that the stock thereafter lost value. In the absence of a specific disclosure in this case, the Court finds that the announcement of the SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct. And after February 18, MCSi stock never recovered; Peppel left on March 11, Stanley resigned on April 4, and NASDAQ delisted MCSi on April 11. There was never another "event" that might close the window on measuring the price effects of the announcement of the SEC investigation.

*Id.* at 22–23 (Page ID #2221–22). We thus reject Peppel's contention that the district court failed to address the causation requirement.

With respect to the government's burden, Peppel contends, as he did below, that the lack of specific information that was available to the investing public renders the district court's amount-of-loss calculation null. U.S.S.G. § 2B1.1(b)(1)(K) advises that a loss of more than $7 million yet less than $20 million results in a twenty-level enhancement. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1)(K) (2002). The comments explain that the term "loss" is "the greater of actual loss or intended loss" and that the term "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. 2(A)(i). "[T]he Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss." *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). "Causation includes two distinct principles, cause in fact, or what is commonly known as 'but for' causation, and legal causation." *Id.* The government thus has the burden to establish both cause in fact and legal causation by a preponderance of the evidence. *Id.* at 582–83. Whether these findings of fact "warrant the application of a particular guideline provision is purely a legal question and is reviewed *de novo* by this court." *Id.* at 582 (internal quotation marks omitted).

In making his argument, Peppel relies heavily on *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). Although it concerns the concept of loss causation in a

white-collar-crime case, *Dura* is inapplicable here.  *Dura* addresses a sufficiency-of-the-pleadings issue in a civil securities-fraud action, a distinction we have previously made. *United States v. Poulsen*, 655 F.3d 492, 514 (6th Cir. 2011) ("But *Dura* was a civil case where the plaintiff had the burden of establishing proximate cause as a necessary element in a claim under the Private Securities Litigation Reform Act and so does not inform our discussion.").

Even assuming *Dura* were applicable to this case, it would not support Peppel's argument.  *Dura*, relying on the Restatement of Torts, explains that "a person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the loss the purchaser sustains when the facts . . . become generally known and as a result share value depreciates."  544 U.S. at 344 (internal quotation marks omitted).  Here, as correctly put forth by the government, class actions were filed alleging that Peppel and MCSi falsely inflated their financial condition, newspaper articles reported these allegations, and less than a month later, an announcement was made informing the investing public as follows:  "MCSi . . . today announced that it has learned of an investigation of the Company by the [SEC] and has received a subpoena from the SEC seeking production of documents. . . ."  Peppel App. Ex. E at 63 (Press Release); *see also* Peppel App. Ex. H at 89–90 (Newspaper Articles). The Harrison class action, filed on February 6, 2003, alleges that "MCSi[] reported strong revenue growth and earnings per share growth throughout the Class Period [(July 24, 2001, to February 26, 2002)].  The design of these artificially inflated earning reports served several purposes, this allowed . . . Defendant Peppel, to liquidate shares of his personal holding in common stock in for proceeds of $4,500,000."  Peppel App. Ex. G at 73 (Harrison Compl. at ¶ 26).  Information concerning Peppel's fraud was thus generally available to the investing public.  Moreover, it does not take a strong inference to connect the publication of this information to the near-immediate $0.87 drop in stock value.  We therefore reject Peppel's contention that the lack of specific information available to the investing public negates the causation findings made by the district court.

We also reject Peppel's cursory contention that his fraudulent conduct had no bearing on the initiation of the SEC investigation. Frankly, it is unreasonable for Peppel, then-CEO, Chairman of the Board, and President of MCSi, to argue that his illegal conduct spanning three years and many transactions did not have any effect on the initiation of the SEC investigation and the subsequent drop in share value simply because the announcement of the SEC investigation did not mention him by name. This argument is especially untenable given that Peppel pleaded guilty to having filed with the SEC the Form 10-Q that included false reports concerning MCSi's financial condition. R. 180 (Statement of Facts at 2) (Page ID #1708). To accept such an argument would in effect require us to evaluate the SEC-investigation announcement in isolation and disregard facts to which Peppel specifically admitted, both of which we decline to do.

In sum, the district court's amount-of-loss determination adequately addressed the causation requirement, and we affirm this portion of its order.

### 2. Factual Findings

Peppel separately argues that the district court's amount-of-loss calculation was faulty and as a result, attributed to him too great a loss. Appellee Br. at 83. "Under the Sentencing Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *Rothwell*, 387 F.3d at 582; *see also United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) ("When reviewing a district court's application of section 2B1.1(b)(1), we review the district court's factual finding as to amount of loss for clear error.").

Concerning the amount-of-loss computation, the application notes explain that "[t]he court need only make a reasonable estimate of the loss. . . . The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he approximate number of victims multiplied by the average loss to each victim." U.S. SENTENCING GUIDELINES § 2B1.1(b) cmt. 2(C)(iii) (2002). We recently echoed these sentiments, stating that the

district court's explanation "does not have to establish the value of the loss with precision; it simply needs to publish the resolution of contested factual matters that formed the basis of the calculation." *Poulsen*, 655 F.3d at 513 (internal quotation marks omitted). Further, the background notes discuss the role of loss in a sentence: "Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline." U.S. SENTENCING GUIDELINES § 2B1.1 cmt. background (2002).

On appeal, Peppel maintains that the district court erred in attributing a loss to the owners of every share of stock between January 15 and February 14, 2003, because "[t]here is no pecuniary harm arising from a securities violation to someone who has purchased prior to the false statement and holds onto the security." Appellee Br. at 83. In making this argument, Peppel relies primarily on the purchaser-seller principle set forth in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975): "the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities." *Id.* at 731–32. We need not evaluate the merits of this theory, however, as a subsequent Supreme Court decision held *Blue Chip Stamps* inapplicable to criminal proceedings: "Criminal prosecutions do not present the dangers the Court addressed in *Blue Chip Stamps*, so that decision is inapplicable to indictments for violations of § 10(b) and Rule 10b-5." *United States v. O'Hagan*, 521 U.S. 642, 665 (1997) (internal quotation marks omitted).

In the absence of direct Sixth Circuit authority addressing this issue, the district court appropriately relied on *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). *Cf. Poulsen*, 655 F.3d at 515 ("Given that Poulsen's Securities Case produced evidence supporting the loss amount, that we have not explicitly adopted a means of calculating loss amount that requires incorporating other causes of loss, and that the district court made a reasonable ruling on the loss amount; we find that the sentence was not procedurally unreasonable."). In *Ebbers*, the Second Circuit recognized that shareholders incur a loss regardless of whether they purchased the shares before or after

the commencement of the fraud: "In this case, therefore, the loss is that suffered by those investors who bought or held WorldCom stock during the fraud period either in express reliance on the accuracy of the financial statements or in reliance on what *Basic, Inc. v. Levinson*[, 485 U.S. 224 (1988),] described as the 'integrity' of the existing market price." 458 F.3d at 126–27.

Additionally, although Peppel accurately contends that *Ebbers* considered the loss calculation "flawed," it did so in order to capture the *undervaluation* of the loss. *Ebbers*, 458 F.3d at 127 ("Investors who held their stock throughout the fraud period were therefore denied the opportunity to reassess and perhaps sell according to their own informed estimates of the declining performance."); *see also id.* at 128 ("Even a loss calculation of $1 billion is therefore almost certainly too low[.]"). The Second Circuit reiterated that although calculating such a loss is difficult, "some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall." *Id.* at 127. Here, the district court acknowledged the undervaluation of loss caused by Peppel's conduct when determining the appropriate proxy: "No doubt the real losses incurred by many shareholders, which would be based on their actual purchase price, was greater than 87 cents per share. Nevertheless, the court believes that the method used will as much as possible, effectively isolate the effects of the fraud on share price." R. 206 (Order at 24) (Page ID #2223).

We find *Ebbers* persuasive, particularly in light of *O'Hagan*. The district court's findings were not clearly erroneous, and we affirm this portion of the district court's order.

## B. Section 2B1.1(b)(2)(B) Enhancement:  Number of Victims

Peppel also argues that the district court erroneously determined that each of the 284 shareholders between January 15 and February 14, 2003, were victims of Peppel's conduct. Appellee Br. at 86, 88. Instead, Peppel contends that the victims were the thirty-nine non-insider shareholders that purchased shares after February 26, 2002, when the false year-end results were publicly announced. *Id.* at 86. Peppel thus asserts that the district court erred in applying the § 2B1.1(b)(2)(B) enhancement, which applies

if the offense "involved 50 or more victims."   U.S. SENTENCING GUIDELINES § 2B1.1(b)(2)(B) (2002).   The government rejoins that the district court correctly determined that all shareholders holding stock on February 14, 2003, incurred a loss as a result of Peppel's conduct.  Reply Br. at 47.

"Whether a person is a victim under the Sentencing Guidelines is a legal conclusion [that appellate courts] review de novo."  *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (internal quotation marks omitted).  The term "victim" is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1) . . . ."  U.S. SENTENCING GUIDELINES § 2B.1.1 cmt. 3(A)(ii) (2002).  Because we agree that all those who bought or held stock when the false information was disseminated by Peppel suffered a loss, as discussed above, we reject Peppel's contention that only those thirty-nine individuals who purchased the stock after the false information was released were victims under the guidelines.  The district court did not err in concluding that all shareholders between January 15 and February 14, 2003, suffered an actual loss as a result of Peppel's conduct, and we affirm the district court's number-of-victims determination.

## V.  CONCLUSION

For the reasons stated, we conclude that the district court imposed a substantively unreasonable sentence of merely seven days, and we thus **VACATE** Peppel's sentence and **REMAND** for resentencing consistent with this opinion.  We **AFFIRM** the district court's amount-of-loss and number-of-victims calculations.