RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

     *v.*

PAUL DAVID MUSGRAVE,

        *Defendant-Appellee.*

No. 13-3872

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton
No. 3:11-cr-00183-1—Timothy S. Black, District Judge.

Argued: June 19, 2014

Decided and Filed: July 31, 2014

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Christian J. Grostic, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio, for Appellee. **ON BRIEF:** Mary Beth Young, Alex R. Sistla, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellant. Christian J. Grostic, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio, for Appellee.

---

### OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. A jury found Paul Musgrave guilty of one count of conspiracy to commit wire and bank fraud and to make false statements to a financial institution; two counts of wire fraud; and one count of bank fraud. The district court sentenced him to one day of imprisonment with credit for the day of processing—a downward variance

1

from his Guidelines range of 57 to 71 months' imprisonment and below the government's recommendation of 30 months' imprisonment. On appeal, the government asserts that Musgrave's one-day sentence is substantively unreasonable. For the following reasons, we vacate the district court's sentence and remand for resentencing.

**I.**

**A.**

In 2008, Paul Musgrave, a certified public accountant, became involved in a tire-recycling venture. Musgrave was referred to Raymond Goldberg, who owned an Australian company called Rubber Solutions, as a supplier for the necessary equipment. Musgrave was unaware at the time that Goldberg had failed in nine previous tire-recycling ventures. Musgrave and Goldberg eventually agreed to form Dayton International Tire Recycling, which was to operate a facility in Troy, Ohio. Pursuant to the Operating Agreement, Musgrave owned 81% of Dayton International, and Intercontinental Trading British Virgin Islands (ITBVI), a shell corporation wholly owned by Goldberg, owned the other 19%. The last page of the Operating Agreement specified that Goldberg was the manager of ITBVI, but it did not reveal that ITBVI was wholly owned by Goldberg.

Dayton International and Goldberg's Rubber Solutions entered into a purchase agreement under which Rubber Solutions would provide equipment and installation for the tire-recycling plant for $2.3 million. Musgrave invested around $300,000 in Dayton International, and Goldberg invested about $350,000 in the form of a "cost reduction," *i.e.*, he discounted the purchase price of the equipment supplied by Rubber Solutions by about $350,000. To finance the remainder of the purchase price, Musgrave applied for a loan, guaranteed by the Small Business Administration (SBA), through Mutual Federal Savings Bank. Musgrave was responsible for securing the loan on behalf of Dayton International.

In order to have the loan proceeds disbursed to Goldberg's bank in Australia, Musgrave was required to obtain an international letter of credit. Musgrave applied for a letter of credit with U.S. Bank, and when choosing the terms of the letter of credit, Musgrave selected "partial shipments not allowed"—if all items were not contained in one shipment, the buyer (Dayton

International) was not required to pay the seller (Rubber Solutions).  In May 2009, all of the equipment arrived except the tire shredder—a "vital" piece of equipment.  Musgrave apparently was livid.  He contacted the FBI, the SBA Office of Inspector General, the SEC, and Australian authorities, which prompted the FBI to commence an investigation.  In the meantime, however, Goldberg falsified a packing slip showing that the shredder would come from Australia (it was supposed to ship from Oregon), and U.S. Bank honored the letter of credit and transferred the $1.7 million to Rubber Solutions's bank.  Goldberg testified that Musgrave directed him to falsify the packing slip.  Rubber Solutions, however, had overdrawn its accounts, and when the $1.7 million arrived, about half of the money was allocated against the overdraft.  The balance Goldberg appropriated to pay his creditors.  The $1.7 million loan to be used for Dayton International's equipment was gone, and Musgrave lost his $300,000 investment in the failed venture.

**B.**

In December 2011, Musgrave and Goldberg were indicted.  Goldberg pled guilty to one count of misprision of felony, and the government agreed to recommend a sentence of three years of probation, restitution, and a special assessment.  Musgrave proceeded to trial and was tried on 10 counts: one count of conspiracy to commit wire and bank fraud and to make false statements to a financial institution in violation of 18 U.S.C. § 1349; six counts of wire fraud in violation of 18 U.S.C. § 1343; one count of bank fraud in violation of 18 U.S.C. § 1344; and two counts of making false statements in a loan application in violation of 18 U.S.C. § 1014.

The government alleged that Musgrave's scheme to defraud Mutual Federal and the SBA involved the concealment or misrepresentation of four facts.  The first was Goldberg's relationship with ITBVI.  The government produced an email from Musgrave to Goldberg which read: "The strategy is to isolate [ITBVI] from [Goldberg] and Rubber Solutions."  Goldberg testified that he understood this to mean that Goldberg and Musgrave were to hide from Mutual Federal the fact that ITBVI was associated with Goldberg and Rubber Solutions.  Musgrave did not disclose to Gary Enz, Mutual Federal's loan officer, that Goldberg was the 100% owner of ITBVI.  Enz testified that he was informed by Musgrave that "a very good friend" would provide capital.  And on the SBA loan application Musgrave was asked: "Do you buy from, sell to, or

use the services of any concern in which someone in your company has a significant financial interest? If yes, provide details on a separate sheet of paper labeled Exhibit L." Musgrave did not identify Goldberg's interest in Rubber Solutions and ITBVI, nor did he provide an Exhibit L.

The second was ITBVI's cash injection into Dayton International. The SBA conditionally agreed to guarantee the loan if Dayton International could establish a cash injection of at least $712,822 prior to disbursement. Goldberg testified that Musgrave directed Rubber Solutions's Chief Financial Officer to fabricate invoices showing that Dayton International received a cash injection from ITBVI when it in fact received a cost reduction. Investigators discovered both the initial invoice, which listed ITBVI's contribution as a "joint venture allowance," and the false invoice, which listed ITBVI's contribution as "Paid."

The third concerned Musgrave's selection of "partial shipments not allowed" as the condition of payment on the international letter of credit. Goldberg testified that he falsified a packing list indicating that the shredder was coming from Australia at the direction of Musgrave, causing U.S. Bank to disburse the $1.7 million pursuant to the letter of credit.

The fourth was the source of Musgrave's cash injection. The government alleged that Musgrave falsely stated that he provided his cash injection from personal savings and home equity when in fact the cash injection came from either one of Musgrave's other companies or his stepfather.

The jury returned a verdict convicting Musgrave of four counts and acquitting him of six. Musgrave was convicted of conspiracy to commit wire and bank fraud and to make false statements to a financial institution; two counts of wire fraud; and one count of bank fraud. His Guidelines range was 57 to 71 months' imprisonment.

**C.**

In considering the 18 U.S.C. § 3553(a) factors, the district court first noted that Musgrave "comes to this courtroom with that history of no criminal convictions and conduct which this judge having heard at trial believes reflects that in the heat of the moment he cut some corners." In considering the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, the court noted that Musgrave had no criminal history

and that he had "decades and decades of service to the community and a family." The court explained that in considering just punishment, it could not ignore the fact that Musgrave had lost $300,000 of his own money in the failed Dayton International venture, that he had "been through four years of hell," that he had "incurred substantial legal fees," that he was likely to lose his CPA license, that he would be required to pay $1.7 million in restitution, and that he would forever be a convicted felon. The district court acknowledged that Musgrave suffered from sleep apnea, which could be fatal if not properly treated, and that employees at another of Musgrave's companies relied on him.

The court then explained the nature and circumstances of the offense: "It's a fraud offense. I think he cut corners. I think he made inaccurate statements and a jury of his peers found unanimously that that was true." The court emphasized that the offense was "a serious offense" and that "[w]hite-collar criminals don't simply get a slap on the wrist. They, like all others, reap what they sow."

In describing Musgrave's history and characteristics, the court stated that "he made mistakes in judgment here and has been held accountable and has been punished significantly before I even act," referring to Musgrave's personal financial loss, the four years of litigation, the legal fees, the loss of his CPA license, the restitution order, and the fact of his felony convictions. In considering the kind of sentences available, the court queried whether imprisonment "would serve any greater societal purpose" or deter him from future frauds. The court concluded that deterrence would not be served by prison time largely because he had been "punished extraordinarily" with "[f]our years of hell, a loss of 300,000, and a receipt of zero from the proceeds, racking up legal fees, losing his CPA license, being required to pay back 1.7 million over time, [and] a felony conviction."

With respect to the Guidelines range, the court believed that the Guidelines overstated Musgrave's culpability and commented that it had "no doubt that Mr. Musgrave did not go into this event with the expectation of ripping somebody off for $1.7 million." As for the need to avoid unwarranted sentencing disparities, the court stated that it had reviewed the government's submission on white-collar sentences and "listened carefully." Two of the cases referenced by the government in its submission to the court were before Judge Black, who observed that

Musgrave was less culpable than those defendants.  The court considered the need for restitution and stated that it would be difficult for Musgrave to pay back the $1.7 million while in prison.

Before announcing the sentence, the court addressed the "relative culpability" between Musgrave and Goldberg.  Judge Black explained that he was "offended to [his] very core by Goldberg's conduct and the fact that the government would enter into a proposed binding plea that if I accept would tie my hands to releasing him on probation."  In the court's view, Goldberg was more culpable than Musgrave and it would be unjust if Musgrave received a longer sentence.  The court then sentenced Musgrave to one day in prison, with credit for the day of processing, three years of supervised release, and a $1.7 million restitution order.

The district court subsequently issued a statement of reasons explaining the variance. The court wrote:

> A downward variance is required to acknowledge that the Government imposed a similar sentence on its cooperating witness whom the Court concluded, upon Defendant's trial, was by far the principal wrong-doer. The sentence also acknowledges that Defendant's characteristics and history reflect a 60 year old who has had no contact with the justice system and has aided the community enormously.  Deterrence has been effected based upon the felony convictions and the likely loss of his CPA license. The sentence facilitates the payment of restitution. Defendant suffers from a potentially fatal condition (sleep apnea requiring a breathing machine while sleeping) that the BOP cannot properly treat. Defendant is of an age where he is not likely to re-offend.

## II.

The government challenges Musgrave's sentence as substantively unreasonable.[1]  The reasonableness of a sentence is reviewed for abuse of discretion, regardless of whether the sentence is inside or outside the Guidelines range.  *Gall v. United States*, 552 U.S. 38, 51 (2007). "[A] sentence falling outside the Guidelines range is not presumptively *un*reasonable." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).  "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the

---

[1]Although the government asserts that the district court's consideration of impermissible factors rendered Musgrave's sentence substantively unreasonable, it is not fully settled within our circuit whether such a challenge involves procedural or substantive reasonableness or both.  *See, e.g.*, *United States v. Chowdhury*, 438 F. App'x 472, 476 (6th Cir. 2011).   Regardless of the precise nature of this particular challenge, Musgrave's sentence is reviewed for reasonableness. *Id.*

sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Id*. A variance is, of course, a relevant consideration when reviewing a sentence. *See Gall*, 552 U.S. at 50. The more significant the variance, the more compelling the justification based on the § 3553(a) factors must be. *Id*.; *see also United States v. Aleo*, 681 F.3d 290, 300 (6th Cir. 2012).

## A.

A defendant's sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2). In imposing a sentence, the district court must explain, based on permissible considerations, how its sentence "'meshe[s] with Congress's own view of the crimes' seriousness.'" *United States v. Peppel*, 707 F.3d 627, 635 (6th Cir. 2013) (quoting *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008)). The collateral consequences of the defendant's prosecution and conviction are "impermissible factors" when fashioning a sentence that complies with this directive. *Peppel*, 707 F.3d at 636. A district court's reliance on these factors "does nothing to show that [the defendant's] sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences— particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *United States v. Bistline*, 665 F.3d 758, 765–66 (6th Cir. 2012). Thus, when a district court varies downward on the basis of the collateral consequences of the defendant's prosecution and conviction, the defendant's sentence will not reflect the seriousness of the offense, nor will it provide just punishment. *See Peppel*, 707 F.3d at 636; *Bistline*, 665 F.3d at 765–66.

Impermissible considerations permeated the district court's justification for Musgrave's sentence. In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already "been punished extraordinarily" by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. "[N]one of these things are [his] sentence. Nor are they consequences of his sentence"; a diminished sentence based on these

considerations does not reflect the seriousness of his offense or effect just punishment.[2] *Bistline*, 665 F.3d at 765.  On remand, the district court must sentence Musgrave without considering these factors.

## B.

Section 3553(a)(2)(B) requires a district court to impose a sentence that affords adequate deterrence, both specific and general.  *See United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010).  A district court must therefore consider, and the sentence imposed must reflect, the need for general deterrence.  *Id*.  In the context of white-collar crime, we have emphasized that "it is hard to see how a one-day sentence" would "serve the goals of societal deterrence." *Davis*, 537 F.3d at 617.  "'Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.'"  *Peppel*, 707 F.3d at 637 (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)); *see also Davis*, 537 F.3d at 617.

Consideration of general deterrence is particularly important where the district court varies substantially from the Guidelines.  *See, e.g.*, *Aleo*, 681 F.3d at 300 (explaining that the greater the variance, the more compelling the justification based on the § 3553(a) factors must be).  This is even truer here, given that the crimes of which Musgrave was convicted are especially susceptible to general deterrence and the fact that there is a general policy favoring incarceration for these crimes.  Indeed, "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes."  *Davis*, 537 F.3d at 617.  More importantly, Congress understood white-collar criminals to be deserving of some period of incarceration, as evidenced by its prohibition on probationary sentences in this context.  *Id*. Where a district court's view of a particular crime's seriousness appears at odds with that of Congress and the Sentencing Commission, we expect that it will explain how its sentence nevertheless affords adequate general deterrence.  *Id*.; *Camiscione*, 591 F.3d at 834.  The district court failed to do so here.

---

[2]The district court did cite the $1.7 million restitution order as reflecting the seriousness of the offense. This is part of the sentence itself.  But it is clear that the district court's sentence was tainted by impermissible considerations.

**III.**

Musgrave must be resentenced. The district court relied on impermissible considerations and failed to address adequately how what amounted to a non-custodial sentence afforded adequate general deterrence in this context. Nevertheless, it bears repeating that "[w]hile appellate courts retain responsibility for identifying proper and improper sentencing considerations after *Booker*, it is not our task to impose sentences in the first instance or to second guess the individualized sentencing discretion of the district court when it appropriately relies on the § 3553(a) factors." *Davis*, 537 F.3d at 618 (citing *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc)). The district court's sentence is vacated, and the case is remanded for the district court, in its discretion, to impose a sentence sufficient but not greater than necessary to serve the § 3553(a) factors.