HOLMES, Circuit Judge,
concurring.
I agree with the majority opinion that Michael Morgan’s conviction must be affirmed and his sentence vacated. More specifically, I concur fully in all of the majority’s thorough and thoughtful order and judgment, except Part IV. That is, I agree with the majority’s disposition of Mr. Morgan’s appeal from his judgment of conviction (Case No. 13-6025). As to that appeal, I merely write separately to express my views on one aspect of the conviction — the nature of the quid-pro-quo element required by 18 U.S.C. § 666(a)(1)(B). Regarding Part IV, though I reach the same conclusion as the majority regarding the proper outcome (i.e., Mr. Morgan’s sentence must be vacated), I do so under a different rationale; I write separately to explicate it.
I
Turning to the conviction, I will assume knowledge of the pertinent facts in light of the majority’s thorough recitation of them. I will discuss the precedent concerning the quid-pro-quo requirement of § 666 and will conclude that the relevant cases all require a quid pro quo, but of a more general sort. Finally, I will explain why the requirement was satisfied in this case.
A
18 U.S.C. § 666(a)(1)(B) makes it a crime if someone
corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more[.]
There is some uncertainty in the law as to what type of quid pro quo, if any, is necessary to satisfy the statutory requirement that the bribe be solicited with the bribee “intending to be influenced or rewarded in connection with” official business. Id. As explained in detail below, the statute does demand a quid-pro-quo showing, but only in the sense of a loose exchange of payment for official action, not in the sense that the bribee must bestow a precise favor that was identified at the time of the bribe.[1]
Some authorities have observed a circuit split on the question of whether § 666 bears a quid-pro-quo requirement and on the nature of that requirement. See United States v. McNair, 605 F.3d 1152, 1189 (11th Cir.2010) (suggesting that the Sixth, Seventh, and Eleventh Circuits, and to some extent the Second, require no “specific quid pro quo,” whereas the Fourth Circuit does); Jared W. Olen, The Devil’s *453 in the Intent: Does 18 U.S.C. § 666 Require Proof of Quidr-Pro-Quo Intent ?, 42 Sw. U. L. Rev. 229, 234-40 (2012) (concluding that the Second, Fourth, and Eighth Circuits have required a quid pro quo whereas the Sixth, Seventh, and Eleventh Circuits have not). A closer reading of the cases, however, finds them readily reconcilable.
To begin, quid pro quo is most traditionally characterized with reference to a specific, one-for-one trade. See, e.g., Black’s Laic Dictionary 1443 (10th ed. 2014) (defining the term as “[a]n action or thing that is exchanged for another action or thing of more or less equal value; a substitute”). In the § 666 bribery context, though, it has been given a more general meaning that essentially just requires the government to show any exchange of a bribe for political action, no matter whether there is a specific connection between the bribe and the favor, such as an explicit request for that particular favor. This position has quite clearly been taken by the circuits that are commonly understood as having imposed a quid-pro-quo requirement. See United States v. Redzic, 627 F.3d 683, 692 (8th Cir.2010) (“[T]he government must present evidence of a quid pro quo, but an illegal bribe may be paid with the intent to influence a general course of conduct. It was not necessary for the government to link any particular payment to any particular action undertaken by [the defendant].”); United States v. Ganim, 510 F.3d 134, 147 (2d Cir.2007) (“[S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act.”);[2] United States v. Jennings, 160 F.3d 1006, 1018 (4th Cir.1998) (“[A] reasonable juror could have concluded that there was a course of conduct involving payments flowing from [the briber] to [the bribee] in exchange for a pattern of official actions favorable to [the briber’s] companies, and that was sufficient to convict [the defendant] of bribery.” (emphases added)).
Cases in the supposedly anti-quid-pro-quo camp are not inconsistent with the aforementioned authorities, as demonstrated by the fact that those courts have rejected a specific quid-pro-quo requirement, i.e., a one-for-one exchange, while not rejecting a quid-pro-quo requirement in the sense of a more general, free-floating exchange where an agreement is reached to exchange a bribe for official action but where the official action is not precisely identified at the time of the bribe. See McNair, 605 F.3d at 1188 (“[T]here is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act termed a quid pro quo.” (emphases added)); United States v. Abbey, 560 F.3d 513, 520 (6th Cir.2009) (“By its terms, [§-666] does not require the government to prove that [the bribee] contemplated a specific act when he received the bribe....” (emphasis added)); United States v. Gee, 432 F.3d 713, 714 (7th Cir.2005) (“Another argument is that the evidence does not establish any specific act that [the bribee] took in response to any specific payment.... Yet the statute does not require any such link.” (emphases add *454 ed)); see also United States v. Terry, 707 F.3d 607, 612 (6th Cir.2013) (explaining, as a general principle, that “[t]he agreement between the public official and the person offering the bribe need not spell out which payments control which particular official acts. Rather, ‘it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor’s behalf as opportunities arose.’” (quoting Abbey, 560 F.3d at 518)).
Even two circuits that have been regarded as mum on the question have suggested a similar approach. See United States v. Garrido, 713 F.3d 985, 996 (9th Cir.2013) (“[Section] 666 does not require a jury to find a specific quid pro quo.” (emphasis added) (citing McNair, 605 F.3d at 1187-89)); United States v. Bryant, 655 F.3d 232, 241 (3d Cir.2011) (“[A] quid pro quo may come in the form of a ‘stream of benefits.’ ”).
In sum, there does not appear to be any real disagreement among the circuits regarding the substance of what § 666 requires, though different courts may use different terminology in describing that substance.
This approach is entirely consistent with the language of § 666. Simply put, the statute contains nothing to imply that the favor must be specifically linked to the bribe in any way. See McNair, 605 F.3d at 1187-88 (“[N]othing in the plain language of '§ 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act.”); Gee, 432 F.3d at 714-15 (“A quid pro quo of money for a specific legislative act is sufficient to violate the statute, but it is not necessary. It is enough if someone ‘corruptly .,. accepts ... anything of value from any person, intending to be influenced or rewarded in connection with’” government business, (quoting § 666(a)(1)(B))). Accordingly, § 666(a)(1)(B) can sustain a conviction where the evidence proves that the bribee accepted the bribe as part of an exchange for political action, even if there is no specific connection between the bribe and a particular action.[3]
B
All that remains is to apply the test. Considering the trial testimony in the light most favorable to the government, the government established the following sequence of events. The Health Department had been citing Mr. Crosby’s business for housing individuals who, according to the Department, should have been in nursing homes. Upset by the citations, Mr. Crosby turned to Mr. Morgan because he “needed some help. [He] didn’t care whether it was a phone call, legislation, meetings, whatever, [he] just needed some help to get them off [his] back.” Aplt. App. at 1905 (test, of Mr. Crosby) (emphasis added). Mr. Morgan then informed Mr. Crosby: “This is the way it works. You pay me a $1,000 a month retainer.” Id. While on that retainer, S.B. 738 was introduced under Mr. Morgan’s name. If enacted as drafted, the Bill would have ameliorated Mr. Crosby’s problems with the Health Department by authorizing longer stays in assisted living for patients with more serious medical needs and by reducing the powers of the Health Department to regulate such matters. The version of the Bill that passed, while substantially revised and more balanced than the initial draft, did in fact help address Mr. Crosby’s concerns.
*455 To distill this narrative and recap, Mr. Crosby came to Mr. Morgan for assistance in fending off the Health Department, including legislative assistance; he paid Mr. Morgan $1,000 a month; and Mr. Morgan introduced a Bill that would have delivered such assistance, if passed as drafted, and that did in fact deliver assistance as enacted. There was an exchange of money for favorable political action and the more general quid-pro-quo test was easily satisfied. Accordingly, I have no difficulty concluding that Mr. Morgan was properly convicted under 18 U.S.C. § 666.
II
We must proceed in considering the propriety of Mr. Morgan’s sentence from the premise that he took a bribe in violation of 18 U.S.C. § 666. At first blush, this fact might seem incongruous with the life that the record reveals Mr. Morgan has otherwise led, involving many positive contributions to the State of Oklahoma. But history and literature chronicle the lives of many otherwise good men (and women) who have allowed pride and arrogance to become the seeds of their own downfall— here, an overweening pride and arrogance that allows a man to believe that he is above the law.
What this case underscores is the consequences of failing to guard against the inherent weaknesses of the human condition. That otherwise good men are subject to these frailties is an important reason that the criminal law must supply a meaningful deterrent. Once properly charged and convicted, the law demands that all persons — no matter their station in life — be held to account for their actions. This is all the more so in a case involving political corruption, a serious offense which erodes the public’s faith in the legitimacy of their government and its leaders. Accountability for such a serious offense calls for a significant punishment. And, as I explain below, I believe it calls for a punishment greater than the probationary sentence that Mr. Morgan received here. We need not celebrate Mr. Morgan’s downfall in order to recognize that he must be held accountable for his proven misconduct. The public must have confidence that there are consequences when their leaders succumb to temptation.
After addressing a preliminary matter— that is, the scope of the government’s sentencing cross-appeal — I proceed to set forth my reasoning for rejecting the district court’s sentencing order.
A
At the outset, I must note that I respectfully disagree with the majority regarding the scope of the government’s cross-appeal: specifically, T believe that the only challenge before us involves the substantive reasonableness vel non of Mr. Morgan’s sentence. I do not view the government as lodging a procedural-reasonableness sentencing challenge and, accordingly, would decline to review any such ostensible claim, even under the rigorous plain-error standard. In other words, I do not believe that the procedural reasonableness of Mr. .Morgan’s sentence is before us; this case should be resolved only with respect to substantive reasonableness.
As the majority explains, we review sentences for reasonableness under a two-step process that consists of procedural and substantive components. See, e.g., United States v. Friedman, 664 F.3d 1301, 1307 (10th Cir.2009) (“Reasonableness review is a two-step process comprising a procedural and a substantive component.”) (quoting United States v. Verdin-Garcia, 616 F.3d 884, 896 (10th Cir.2008)). Where both components are at issue in a sentencing appeal, we would ordinarily begin with the *456 procedural component and consider the substantive component only if necessary to determine whether the district court erred. See Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (“Assuming. that the district court’s sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence _”). But the government here did not preserve a procedural-reasonableness argument in the district court or on appeal. See United States v. Gantt, 679 F.3d 1240, 1247 (10th Cir.2012) (“To preserve [a procedural unreasonableness challenge] for appeal, [the] [defendant needed to alert the court that its explanation was inadequate, which ordinarily would require an objection after the court had rendered sentence. The court could then cure any error by offering the necessary explanation.”); United States v. Romero, 491 F.3d 1173, 1177 (10th Cir.2007) (holding that “the requirement of contemporaneous objection to procedural errors is consistent with our precedent and represents a reasonable burden on defendants”).
The government did not object to Mr. Morgan’s sentence on procedural-reasonableness grounds. Indeed, the record offers not a single clue that such a procedural-reasonableness challenge was ever made before the district court. At the sentencing hearing, after the district court explained its sentence, it advised Mr. Morgan of his right of appeal and stated, “Your period of probation begins immediately. I advise you to have a discussion with the probation office before you leave the building.” Aplee. App. at 1249 (Sentencing Tr., dated Jan. 8, 2013). The district court then asked, “Is there anything else from counsel,” to which the government responded, “No, Your Hon- or.” Id. The district court then adjourned the sentencing proceedings, having heard no objections to the sentence. At no point before or after this exchange did the government refer to the procedural reasonableness of the sentence.
The government therefore forfeited any procedural-reasonableness argument in the district court and, if it is entitled to review at all, it would only be for plain error. See United States v. McGehee, 672 F.3d 860, 873 (10th Cir.2012) (“Unlike waived theories, we will entertain forfeited theories on appeal, but we will reverse a district court’s judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result.”) (quoting Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1128 (10th Cir.2011)); United States v. Vasquez-Alcarez, 647 F.3d 973, 976 (10th Cir.2011) (“If he has forfeited the stale conviction argument, we review the substantive reasonableness of his sentence only for plain error.”). The government, however, has not asked for plain-error review of a procedural-reasonableness challenge. Instead, it frames the issue on appeal solely as a challenge to the substantive reasonableness of Mr. Morgan’s sentence. See Aplee. Opening Br. at 47 (“The district court’s downward variance to probation was substantively unreasonable.”). Indeed, the government’s briefing does not refer — even once — to procedural unreasonableness.
Because the government has not requested plain-error review of a procedural-reasonableness challenge, much less made an argument to this effect, we should not consider this forfeited error on appeal. See, e.g., Richison, 634 F.3d at 1131 (“And the failure to do so — the failure to argue for plain error and its application on appeal — surely marks the end of the road for an argument for reversal not first presented to the district court.”); see also United States v. Lamirand, 669 F.3d 1091, 1098 n. 7 (10th Cir.2012) (“Mr. Lamirand has not asked us to review his late-blooming argu *457 ment for plain error. Accordingly, we decline to do so and will not definitively opine on the merits of this argument.”). Moreover, because the government has made no procedural-reasonableness argument in its opening brief, it has waived — on this separate and independent basis — any procedural-reasonableness challenge. See, e.g., Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir.2007) (“[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant’s opening brief.”); accord United States v. Cooper, 654 F.3d 1104, 1128 (10th Cir.2011).
B
In my view, therefore, the only challenge before us on the government’s cross-appeal relates to the substantive reasonableness vel non of Mr. Morgan’s sentence. After briefly summarizing the relevant facts, I explicate my rationale for concluding that Mr. Morgan’s sentence is substantively unreasonable, and that the district court erred by imposing it.
1
The district court calculated an advisory sentencing range of forty-one to fifty-one months pursuant to the United States Sentencing Guidelines (“U.S.S.G.” or “the Guidelines”). That numerical range was derived by applying Guidelines that were specifically designed to deal with political corruption and specifically set with deterrence in mind. See Aplee. App. at 1267 (Presentence Investigation Report, filed Aug. 21, 2012) (calculating a base offense level of fourteen pursuant to U.S.S.G. § 201.1(a)(1) because Mr. Morgan was a public official); United States v. Ruiz-Terrazas, 477 F.3d 1196, 1200 (10th Cir.2007) (“In setting forth the purposes and goals of the Guidelines, Congress specifically charged the Sentencing Commission with the task of formulating a structure for sentencing that would ‘assure the meeting of the purposes of sentencing as set forth in [18 U.S.C. § ] 3553(a)(2),’ ” including general deterrence, (alteration in original) (quoting 28 U.S.C. § 991(b)(1)(A))); S.Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259 (“[Deterrence] is particularly important in the area of white collar crime.”). From that numerical range, the court varied downward to a sentence of no imprisonment, a probationary term of five years, 104 hours of community service, and forfeiture of $12,000.
As pertinent here, the court explained its sentence as follows:
Of course, I start with the calculation of the guideline[s] range and then go on to consider what sentence is enough but no more than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense....
So in this case, I look at the seriousness of the offense, adequate deterrence not only for you but for others, and promoting respect for the law. '
I began with my view of the evidence. I sat through this, as did the jury, and I had definite opinions about the evidence that I don’t get to voice when the jury does, but you were convicted on only one of 63 counts.
One of the many letters submitted [o]n your behalf suggested that I figure out what your sentence should be — I suppose under the guidelines — and then divide it by 63 to come up with a fair sentence. I actually thought that was not such a bad idea, but I could not figure out the math to do it.
But, clearly, you were charged with a lot, you were convicted with very little. And that conviction,' as [defense counsel] has pointed out today, was based on *458 some very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about.
So in this case I’m looking at the harm that was done. Certainly the harm is always to the reputation of legitimate state government. That suffers many places, sometimes in Oklahoma more than others. And that’s certainly a value to be respected and for which punishment should be meted out.
I look at this book of letters. I’ve thought often, I don’t think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.
And so many of these people have asked for consideration of probation or other leniency [o]n your behalf,
The one thing that [the government] argues in favor of a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.
I am personally of the opinion that the publicity that has followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else considering the same conduct.
For all these reasons, I am varying downward from the guideline[s] range and imposing a sentence of probation.
Aplee. App. at 1246-48 (Sentencing Tr., dated Jan, 8,2013).
2
Unlike the majority, given the current state of the law regarding substantive-reasonableness review as defined by the Supreme Court and our court, I do not think that we can ever “easily conclude” that a sentence is substantively unreasonable. Maj. Op. at 448; see, e.g., United States v. Wittig, 528 F.3d 1280, 1289 (10th Cir.2008) (Hartz, J., concurring) (“This court’s present approach appears to be that a sentence is substantively reasonable if the sentencing judge provides reasons for the length of the sentence.... Under this court’s present approach we may go through the motions of substantive-reasonableness review, but it will be an empty gesture,”); United States v. Smart, 518 F.3d 800, 808 (10th Cir.2008) (“We may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo. Instead, we must ‘give due deférence to the district court’s decision that the § 3553(a) factors, on a whole, justify the extent of the variance,’ ” (quoting Gall, 552 U.S. at 51, 128 S.Ct. 586)).[4] However, *459 upon careful review of the record and the district court’s rationale, I do agree with the majority that the court’s sentence is substantively unreasonable.
This ease is helpfully viewed through the lens of the one precedential decision, where we did reverse a sentence as substantively unreasonable — United States u Friedman, supra. The district court there sentenced “a serial bank robber,” 554 F.3d at 1302, to a sentence of fifty-seven months in prison, “a ninety-four month variance from the bottom of the advisory Guidelines range,” id. at 1308. On the government’s appeal, we reversed the sentence as substantively unreasonable. Id, at 1312. At the start of our analysis, we observed that “the undeniably sparse record in th[e] case certainly bears on the question whether [the defendant’s] sentence is substantively reasonable.” Id. at 1308 n. 10, We then remarked that “the district court simply disregarded the career offender provisions” that were applicable and that it “never identified how the nature of the [offense] or [the defendant’s] individual characteristics supported a sentence amounting to 38% of the bottom of the advisory Guidelines range.” Id. at 1308. It was not enough, we concluded, that the district court had a “hunch” or “feeling” that recidivism was unlikely. Id. at 1308 n. 11. Given these gaps in the record, we could discern nothing to suggest “that the sentence imposed by the district court is reasonable in light of the factors set out in [18 U.S.C.] § 3553(a).” Id. at 1310.
We then turned to the specific arguments for the sentence, and rejected the defendant’s contention that “the district court simply disagreed with the career offender provisions of the Guidelines.” Id. at 1311. Although we recognized that the district court would have been entitled to express such a disagreement, it did not do so, offering only an “exceedingly limited and ambiguous statement” in defense of the variance. Id. At most, the district court’s justification indicated that it believed there was “something about the nature of the [offense] and [the defendant’s] history and characteristics [that] called for a substantial variance from the advisory Guidelines range.” Id. Since that determination was “unsupported by the record,” it constituted “an abuse of discretion.” Id. At the close of our discussion, we reiterated that “the very limited nature of the record and the paucity of reasoning on the part of the district court most certainly bear on our review of the substantive reasonableness of [the defendant’s] sentence.” Id. at 1312. Given those shortcomings in the record, we reversed and remanded for resentencing. Id.
While Friedman is not factually on all fours with the instant case, in my view, it supplies the appropriate analytical framework for our review. Just as in Friedman, we deal here with a substantive-reasonableness challenge to a significant downward variance from the Guidelines. And, just as in Friedman, the current record offers us no grounds to find that downward variance substantively reasonable. As a result, Friedman counsels that a remand for resentencing is mandated here. Cf United States v. Lente, 759 F.3d *460 1149, 1174-75 (10th Cir.2014) (in rejecting a substantive-reasonableness challenge, stating “[w]e also underscore the important role of the extensive record created in this case”.... “the type of record we expect to see when reviewing a sentence far outside the advisory Guidelines range” (citations omitted)).
I will first explain why under the circumstances of this case our substantive-reasonableness review, while deferential, must be sensitive to the need for a justification on the record to warrant a significant downward variance. Then, I will demonstrate how that justification is absent here, thus mandating a remand for resentencing.
3
There are two related reasons why our review of the record for the justification for Mr. Morgan’s sentence must be especially searching here: (1) the district court varied sharply from the Guidelines; and (2) the applicable Guidelines are deliberately structured to avoid purely probationary sentences, like Mr. Morgan’s, in white-collar prosecutions.
a
The classic variance case is one in which a district court deviates from the Guidelines because the advisory Guidelines range fails to “fully account for the” punishment that would otherwise be appropriate under 18 U.S.C. § 3553(a). United States v. Scott, 529 F.3d 1290, 1304 (10th Cir.2008). However, it is undisputed that “the Guidelines should be the starting point and the initial benchmark” of sentencing. United States v. Ray, 704 F.3d 1307, 1315 (10th Cir.2013) (quoting Gall, 552 U.S. at 49, 128 S.Ct. 586). The substantive-reasonableness inquiry must be able to detect a reason for the variance from the Guidelines that is grounded in the factors enumerated in § 3553(a). See United States v. Robertson, 568 F.3d 1203, 1206 (10th Cir.2009) (“[A] ‘variance’ occurs when a district court reaches a sentence that differs from the recommended Guidelines range through the application of the factors outlined in 18 U.S.C. § 3553(a).” (emphasis added)); United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1216 (10th Cir.2008) (“[W]hen the district court varies from the advisory Guidelines range through application of the § 3553(a) factors, we simply consider whether the length of the sentence is substantively reasonable. ... We ... ‘must give due deference to the district court’s decision that the § 3553(a) factors, on a whole, justify the extent of the variance.’ ” (emphases added) (citations omitted) (quoting United States v. Munoz-Nava, 524 F.3d 1137, 1146 (10th Cir.2008))); United States v. Pinson, 542 F.3d 822, 836 (10th Cir.2008) (“In light of the § 3553(a) factors and recognizing the discretion vested in the district court over sentencing, we find this [variant] sentence reasonable — ” (emphasis added)).
Moreover, because the Guidelines play such a core role at sentencing, it stands to reason that the size of a variance would inform our inquiry regarding a sentence’s substantive reasonableness. See United States v. Shuck, 713 F.3d 563, 570 (10th Cir.2013) (“In reviewing the district court’s sentence for substantive reasonableness, this court ... will ‘take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.’” (emphasis added) (quoting Gall, 552 U.S. at 51, 128 S.Ct. 586)). Stated differently, the larger the discrepancy between the sentence and the advisory Guidelines range, the more of a foundation there must be in the § 3553(a) factors to justify that discrepancy. See Friedman, 554 F.3d at 1308 n. 10 (“[W]hen a district court varies from the advisory Guidelines *461 range it ‘must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance,’ especially given that ‘a major [variance] should be supported by a more significant justification than a minor one.’” (second alteration in original) (quoting Gall, 552 U.S. at 50, 128 S.Ct. 586)).
With these background principles in hand, it becomes clear why we must be especially discerning in our search for valid § 3553(a) factors to support the variance here. The district court varied from the Guidelines to a substantial degree, dropping from three-and-a-half years at the low end of the advisory range to zero. More to the point, the variance was a tremendous one in terms of kind — that is, qualitatively. A non-custodial punishment is qualitatively different than one that involves imprisonment. In other words, there is an obvious difference between a sentence that goes from, say, seven years of imprisonment to three-and-a-half years, and a sentence that goes from three-and-a-half years to nothing (i.e., no period of incarceration). Cf. Gall, 552 U.S. at 48, 128 S.Ct. 586 (“We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.”).
In the latter situation (i.e., a downward variance to zero imprisonment), the variance deviates from the Guidelines to the fullest extent possible, and as a result our review should be as searching as the deferential standard of review allows. Cf. United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir.2013) (‘We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence [in a white-collar prosecution].”); United States v. Pugh, 515 F.3d 1179, 1195 (11th Cir.2008) (“Quite simply, by imposing a non-custodial sentence, the district court accorded no weight to general deterrence.” (emphasis added)); Pugh, 515 F.3d at 1199 (noting that a probationary sentence “afforded precious little if any weight” to the need to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense).
b
A large variance from a meaningful Guidelines prison sentence to a probationary term should trigger a close look at the record — guided by the § 3553(a) factors— under any circumstances. However, it triggers an even closer look in the context of case like this one, as the relevant Guidelines provisions were deliberately adopted to ensure that white-collar offenders, like Mr. Morgan, were treated comparably to their blue-collar counterparts, who historically have received harsher sentences.
This aspect of the Guidelines has been aptly described by Judge (now-Justice) Breyer, who was a member of the first Sentencing Commission and participated in that capacity in the creation of the first edition of the Guidelines. See Carissa Byrne Hessick, Appellate Review of Sentencing Policy Decisions After Kim-brough, 93 Marq. L. Rev. 717, 727 (2009) (“Prior to his appointment to the Supreme Court, Justice Breyer served as one of the original U.S. Sentencing Commissioners and is often referred to as the principal author of the original Guidelines.”). In an informative law review article, then-judge Breyer explained how the Guidelines’ approach to sentencing white-collar offenders was devised:
The Commission found in its data significant discrepancies between pre-Guide-line[s] punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission’s statistics indicated that where white-collar fraud was involved, *462 courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.
Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Best, 17 Hofstra L. Rev. 1, 20-21 (1988) (footnotes omitted).
In addition to equitable concerns, the Guidelines’ preference for confinement of white-collar criminals is motivated by other significant interests. For one, “probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class,” United States v. Levinson, 543 F.3d 190, 201 (3d Cir.2008); accord United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir.2006), and Congress has spoken out forcefully against any practice that tends to soften the sentences of the rich and powerful merely because they are rich and powerful, see 28 U.S.C. § 994(d) (“The Commission shall assure that the guidelines and policy statements are entirely neutral as to the ... socioeconomic status of offenders.”). Moreover, it is especially important that white-collar sentences effectuate the general-deterrence aims of criminal punishment. See United States v. Hayes, 762 F.3d 1300, 1308 (11th Cir.2014) (“[W]e have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed.”); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir.2006) (“Because economic and fraud-based crimes are ‘more rational, cool, and calculated than sudden crimes of passion or opportunity,’ these crimes are ‘prime candidate^] for general deterrence,’.” (alteration in original) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005))); accord United States v. Musgrave, 761 F.3d 602, 609 (6th Cir.2014); United States v. Peppel, 707 F.3d 627, 637 (6th Cir.2013).
After considering this legal landscape, one of our sister circuits went so far as to say that “[o]ne of the central reasons for creating the sentencing guidelines” as a whole “was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes.” United States v. Davis, 537 F.3d 611, 617 (6th Cir.2008); accord Musgrave, 761 F.3d at 609. I need not go so far here, as the instant case does not require me to opine about the overarching purposes of the Guidelines. Suffice it to say that there can be no doubt that, at a minimum, the Commission’s desire to equalize penalties for white-collar and blue-collar crime — by strengthening the former — is patently an important concern undergirding the white-collar sentencing provisions. See, e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir.2012) (discussing the importance that the Commission and Congress have placed on “the minimization of discrepancies between white- and blue-collar offenses” (quoting Mueffelman, 470 F.3d at 40)); United States v. Treadwell, 593 F.3d 990, 1012 (9th Cir.2010) (same); Levinson, 543 F.3d at 201 (“The Sentencing Commission recommended terms of imprisonment for economic crimes like [the defendant’s] because of its concern that sentencing for white-collar crime had been ineffectual”).
Now that the Guidelines are advisory rather than binding upon the district courts, see Booker, 543 U.S. at 245, 125 *463 S.Ct. 738, “short but certain terms of confinement for many white-collar offenders,” Breyer, supra at 20 (emphasis added), is no longer a goal that the Guidelines can achieve, as district courts retain the discretion to vary below the Guidelines where appropriate and a prison term is consequently no longer “certain.” See, e.g., Smart, 518 F.3d at 810 (“Applying the appropriate legal standard of review provided by Gall and Kimbrough[, 552 U.S. 85,128 S.Ct. 558,169 L.Ed.2d 481 (2007) ], and crediting the district court’s reasoned consideration of these multiple sentencing factors, we fail to perceive any abuse of discretion in sentencing [the defendant] to a below-Guidelines sentence.”). Nevertheless, the Guidelines’ policy interest in confinement for most white-collar offenders is an important one, and because “the Guidelines should be the starting point and the initial benchmark” at sentencing, Ray, 704 F.3d at 1315 (quoting Gall, 552 U.S. at 49, 128 S.Ct. 586), that policy should remain a central consideration for a district court sentencing a white-collar criminal.
Indeed, the sentencing patterns of district courts, both prior to and after Booker, in the specific area of white-collar prosecution at issue here — political corruption— suggest that courts have demonstrated strong fidelity to the foregoing policy concerns and, consequently, have consistently declined to impose probationary sentences on corrupt government officials. More specifically, district courts have generally imposed some prison time in § 666 bribery cases, no matter how small the dollar amount of the bribes. See, e.g., United States v. Richard, 775 F.3d 287, 291 (5th Cir.2014) (affirming thirty-three month sentence for soliciting and accepting $10,000 in bribes); see also United States v. Reid, 764 F.3d 528, 531-32 (6th Cir. 2014) (mentioning sixty-month sentence for accepting $10,000 to $20,000 in bribes); United States v. Owens, 697 F.3d 657, 658 (7th Gir.2012) (mentioning a one-year-and-one-day prison sentence for accepting $1,200 in bribes); United States v. Curescu, 674 F.3d 735, 737-38 (7th Cir.2012) (mentioning a sentence of forty-one months for accepting a bribe of $1,000); United States v. Robinson, 663 F.3d 265, 267-68 (7th Cir.2011) (mentioning a ten-year sentence for paying a $1,000 bribe and offering more); United States v. Beldini, 443 Fed.Appx. 709, 712-13 (3d Cir.2011) (mentioning a sentence of thirty-six months’ imprisonment for receiving two $10,000 bribes); United States v. Anderson, 517 F.3d 953, 958 (7th Cir.2008) (mentioning a sentence of six years for offering a $10,000 bribe); United States v. Gonzalez, 193 F.3d 516, 1999 WL 706102, at *1 (5th Cir.1999) (per curiam) (unpublished table decision) (mentioning a sentence of one year and one day for accepting $600 worth of bribes in violation of § 666(a)(1)(B)); United States v. Agostino, 132 F.3d 1183, 1188-89 (7th Cir.1997) (mentioning a sentence of four months for offering a bribe of $4,000).
Tellingly, in the rare § 666 cases where district courts have imposed probationary sentences, the seemingly uniform result on appeal has been reversal of the sentence and remand for resentencing. In United States v. Hayes, the Eleventh Circuit vacated the probationary sentence of a defendant convicted of paying over $600,000 in bribes. 762 F.3d at 1310-11. Despite the defendant’s cooperation with the government, the court concluded that the sentence was substantively unreasonable because it failed to provide “just punishment for [the defendant’s] offense or promote respect for the law,” id. at 1311, did not “provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time,” id. (quoting United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir.2009)), *464 and was not necessary to eliminate any sentencing disparity because no such disparity existed, id. Further, in United States v. Faria, 161 F.3d 761 (2d Cir.1998) (per curiam), the Second Circuit vacated the defendant’s sentence because the district court improperly departed downward to a probationary sentence. Id. at 762-63.
In the instant case, the district court did not express a disagreement with the white-collar sentencing policy of the Guidelines that favors custodial sentences for offenders — which of course it would have been free to do, see, e.g., Spears v. United States, 555 U.S. 261, 265-66, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (per curiam); United States v. Lopez-Macias, 661 F.3d 485, 490 (10th Cir.2011). Accordingly, I would be hard-pressed under any circumstances to conclude that Mr. Morgan’s purely probationary variant sentence is substantively reasonable. If a probationary sentence could ever be appropriate on facts such as these (and I doubt it), there would need to be an especially strong justification grounded in the § 3553(a) factors. In the next section, I will explain why it is patent that such a justification is absent here.
4
Having described the lens through which, in my view, we must evaluate Mr. Morgan’s sentence, I can now consider its substantive reasonableness. When analyzing the substantive reasonableness of a sentence, we ask “whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a).” United States v. Chavez, 723 F.3d 1226, 1233 (10th Cir.2013) (quoting United States v. Reyes-Alfonso, 653 F.3d 1137, 1145 (10th Cir.2011)). I will examine the justifications offered by the district court to support its sentence and will find that they cannot carry the weight assigned to them.
Beyond the pro forma references to the § 3553(a) factors, the district court made only four substantive points to justify Mr. Morgan’s sentence: (1) his conviction was based on questionable evidence; (2) the legislative action that resulted from the bribe was not objectionable; (3) Mr. Morgan had already been effectively punished by means of negative publicity, financial losses, health problems,, and his likely disbarment; and (4) Mr. Morgan enjoyed the support of many in the community. I address these justifications below.
a
The first two points are not proper considerations. Starting with the district court’s criticism of the evidence, it would be extremely concerning if the district court in fact imposed a lighter sentence on Mr. Morgan because it doubted the validity of his conviction. Once a defendant has been afforded a trial, it is up to a jury of his peers to decide his guilt vel non. It is not for a sentencing court to revisit the question. See United States v. Bertling, 611 F.3d 477, 482 (8th Cir.2010) (“[W]hile the district court has considerable discretion under 18 U.S.C. § 3553(a) ,,, that discretion does not extend to nullifying the jury’s verdict____”); United States v. Hunt, 521 F.3d 636, 649 (6th Cir.2008) (“The district court appears to have relied in substantial part on its doubt that [the defendant] intended to commit fraud.... [I]t would be improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt.”); United States v. Rivera, 411 F.3d 864, 866 (7th Cir.2005) (“[I]t is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant’s favor, a factual issue *465 that the jury has resolved in the prosecutor’s favor beyond a reasonable doubt.”).
Put another way, in the exercise of its constitutional duty, a jury convicted Mr. Morgan of accepting a bribe in exchange for taking legislative action. The district court was required to honor that finding, and so are we. As the majority’s analysis indicates, insofar as the court weighed this improper factor in its sentencing calculus, it committed procedural error. See United States v. Story, 635 F.3d 1241, 1244 (10th Cir.2011) (“A sentence is procedurally unreasonable if it is based on. consideration of an impermissible factor.” (emphasis added)); Smart, 518 F.3d at 803 (holding that when “a district court bases a sentence on a factor not within the categories set forth in § 3553(a)” it commits a “form of procedural error” (emphasis added)). However, properly before us is only a challenge to the substantive reasonableness of Mr. Morgan’s sentence. And, in that context, the important point is that we should not use any purported verdict-doubt rationale as a basis for finding the district court’s sentence substantively reasonable.
The same is true for the district court’s second justification for the sentence: that “no one has ever complained about” S.B. 738. Aplee. App. at 1247. Bribery is not illegal because it leads to inferior legislation; it is illegal because it “betrays the public trust” and thereby undermines “the critical importance of representative self-government.” United States v. White, 663 F.3d 1207, 1217 (11th Cir.2011); accord United States v. Lipscomb, 299 F.3d 303, 309 (5th Cir.2002) (lead opinion) (discussing “the corrupting, public-trust eroding effects of bribery” that are targeted by § 666 (quoting United States v. Apple, 927 F.Supp. 1119, 1124 (N.D.Ind.1996))); United States v. Ford, 21 F.3d 759, 765 (7th Cir.1994) (noting that “every act of public bribery inherently entails an abuse of public trust”). Citizens are entitled to the services of representatives who evaluate bills with an honest eye on how those bills will potentially affect the people, rather than an avaricious eye on how those bills will potentially line the representatives’ own pockets. See United States v. Rosen, 716 F.3d 691, 694 (2d Cir.2013) (“The corruption of elected officials undermines public confidence in our democratic institutions.”). When a legislator takes official action on a bill in return for money, he irreparably and egregiously betrays this public trust, and his betrayal is no less grave when the bill actually turns out not to do any harm.[5] See City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, *466 378, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (noting, in dicta, that “[a] mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid”). The damage is done the moment the bribe is accepted — and the harm is the most serious imaginable to our system of government.[6]
b
That leaves only two potential reasons for the variance that at least colorably implicate the factors set forth in 18 U.S.C. §§ 3553(a)(2)(A) and (B): that Mr. Morgan had already suffered enough, such that no imprisonment was necessary; and that Mr. Morgan was beloved in his community.
The district court expressed the first point in the following terms:
The one thing that [the government] argues in favor of a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.
I am personally of the opinion that the publicity that has followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else' considering the same conduct.
Aplee. App, at 1247-48. This passage could be construed as directed at the general-deterrence goals of § 3553(a)(2)(B). The problem is that there is no reasonable basis for finding the statute’s general-deterrence interest satisfied.
Consider the language of § 3553(a)(2)(B), which directs a district court to consider “the need for the sentence imposed ... to afford adequate deterrence to criminal conduct.” § 3553(a)(2)(B) (emphasis added). To say that negative publicity has provided adequate deterrence, as the district court did, is to essentially say that there is no need for the sentence to provide any deterrence at all: the deterrence has all come from the consequences of the investigation and prosecution, and the sentence has nothing left to add.
As the Sixth Circuit pointed out in a similar scenario, the sorts of harms recited by the district court here are not “consequences of [a defendant’s] sentence, as opposed to consequences of his prosecution and conviction,” and if they could justify a lighter penalty then they “would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.” United States v, Bistline, 665 F.3d 758, 765-66 (6th Cir.2012); accord Musgrave, 761 F.3d at 608. By law, we should not countenance that result. See 28 U.S.C. *467 § 994(d) (“The Commission shall assure that the guidelines and policy statements are entirely neutral as to the ... socioeconomic status of offenders.”); U.S.S.G. § 5H1.10 (noting that socioeconomic status is “not relevant in the determination of a sentence”).[7]
It is hardly surprising that a prosecution for political corruption would draw some negative attention from the media, and that it would cause financial and physical problems for a defendant. In fact, it would be surprising if such a prosecution failed to have some of these consequences. The Commission was surely aware of that possibility when it crafted the Guidelines, as anyone would be. It follows ineluctably that the Guidelines’ strong preference for “certain terms of confinement” for white-collar offenders, Breyer, supra, at-20, is predicated on the notion that negative publicity and like collateral consequences are not enough to generate sufficient general deterrence in most bribery cases. The district court did not explain why the difficulties experienced by Mr. Morgan due to the prosecution were so unusually intense that imprisonment was unnecessary, and the record does not bridge that gap. Cf United States v. Warner, 792 F.3d 847, 862 (7th Cir.2015) (“While [the defendant’s] prosecution has been more public than most, we agree that this fact deserves little, if any, weight.”); Musgrave, 761 F.3d at 607 (finding a one-day prison sentence substantively unreasonable despite the district court’s belief that the white-collar defendant had “ ‘been punished extraordinarily1 by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life”). In my view, Mr. Morgan’s probationary sentence cries out for a strong and meaningful general-deterrence justification; the district court failed to provide one.
Lastly, in relying on the extent to which Mr. Morgan is beloved in the community, the district court arguably addressed “the history and characteristics of the defendant." § 3553(a)(1). It did so in the form of the following statement:
I look at this book of letters. I’ve thought often, I don’t think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.
And so many of these people have asked for consideration of probation or other leniency [o]n your behalf.
Aplee. App. at 1247.
It is certainly permissible for a sentencing court to take into account letters of support for a defendant. See, e.g., United States v. Sayad, 589 F.3d 1110, 1118-19 (10th Cir.2009) (affirming the substantive reasonableness of a probationary sentence that was based in part on “letters from [the defendant’s] community”); Munoz-Nava, 524 F.3d at 1149 (affirming the substantive -reasonableness of a one-year-and-one-day prison sentence that was based in part on the defendant’s “many letters of support”).[8] That said, the letters — standing alone — cannot justify this variance when: (1) the variance is substantial in quality and quantity; (2) the Guidelines *468 provisions at issue express a powerful interest in imprisonment; and (3) the only other arguably relevant discussion implicating the § 3553(a) factors — which related to general deterrence — was woefully inadequate. Cf United States v. Hampton, 441 F.3d 284, 288 (4th Cir.2006) (“In order to withstand reasonableness scrutiny, such a dramatic variance from the advisory guideline[s] range must be supported by compelling justifications related to § 3553(a) factors, and ‘excessive weight’ may not be given to any single factor.” (citation omitted) (quoting United States v. Green, 436 F.3d 449, 457 (4th Cir.2006))).
5
To summarize, the only comments the district court made that are even arguably addressed to the § 3553(a) factors do not give us a basis to affirm the substantive reasonableness of its sentence. The reversible error here is the imposition of a variance that cannot be justified with reference to the record and the § 3553(a) factors. The courts must be especially vigilant in encouraging obedience to political corruption laws because, as evident in the instant case, the integrity of the lawmaking process itself may be at stake. See Hayes, 762 F.3d at 1309 (“Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government.... [Bjribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently.”). A “just punishment” for *469 the offense of perverting our democratic system of government will generally be the punishment imposed upon the most serious of offenders: that is, imprisonment. Cf. Livesay, 587 F.3d at 1278 (“Probation [in a white-collar prosecution] does not account for the seriousness of [the defendant’s] conduct. It does not punish him sufficiently.... It does nothing to encourage respect for the court system in this country,” (quoting United, States v. McVay, 294 Fed.Appx. 488, 490 (11th Cir.2008))).
All of these concerns are particularly potent in the instant circumstances. Mr. Morgan was president pro tempore of the Oklahoma Senate. He was entrusted with a weighty responsibility in the legislature, where he played an important role in shaping the laws that governed his State and its people. See Okla. Const, art. V, § 28 (requiring the president pro tempore to “preside over [the Senate’s] deliberations in the absence or place of the Lieutenant Governor”); Kevin M. Abel, The Constitutional Mandate that the Lieutenant Governor Presides Over the Senate, 27 Okla. City U.L. Rev. 645, 646-48 (2002) (discussing the expansive powers enjoyed by the president pro tempore of the Senate). When a jury convicted Mr. Morgan of accepting a bribe in exchange for offering a political favor, he was guilty — in the eyes of the law — of trading his office for personal enrichment.
A democratic government cannot function when those occupying the most elevated offices act to benefit themselves rather than the citizenry for which they work and to which they owe their highest loyalty. See Rosen, 716 F.3d at 694 (“The corruption of elected officials undermines public confidence in our democratic institutions.”). In the absence of any explanation to the contrary — an explanation that is not in the record before us — § 3553(a)’s factors called out for a penalty that would convey a strong message of judicial intolerance for political corruption, and that message was not sent by Mr. Morgan’s probationary sentence. Cf. Pugh, 515 F.3d at 1195 (“Quite simply, by imposing a noncustodial sentence, the district court accorded no weight to general deterrence.” (emphasis added)); id. at 1199 (noting that a probationary sentence “afforded precious little if any weight to the principles underlying 18 U.S.C. § 3553(a)(2)(A)”).
In my view, it is not the charge of an appellate court to dictate the sentence that a particular defendant should receive. “We defer to the district court’s weighing of the 18 U.S.C. § 3553(a) factors” when it weighs them. United States v. Masek, 588 F.3d 1283, 1290 (10th Cir.2009); cf. United States v. Lente, 647 F.3d 1021, 1039 (10th Cir.2011) (“Perhaps the government is right that the district court will reach the same outcome after it fills in this gap [regarding potential sentencing disparities], but— [w]e cannot fulfill our appellate role, however deferential, in assessing the substantive reasonableness of the sentence without the gap having been filled.”). However, when the district court never properly examines factors that may militate against the chosen sentence, and when there is no other discernible basis for approving that sentence as reasonable, reversal and remand is our. only option. If a probationary sentence for Mr. Morgan could ever survive substantive-reasonableness review — and I highly doubt it — it would require an especially detailed and persuasive application of the § 3553(a) factors to these facts. The district court’s analysis does not provide anything remotely close to that. Accordingly, in my view, the sentence cannot be upheld.
III
For the reasons stated, I respectfully concur and fully join in all of the majority’s *470 thoughtful and thorough order and judgment, except for Part IV. As to that Part, I concur in the judgment, which reverses the district court’s sentencing order and remands for resentencing. I have written separately to set forth what I deem to be the appropriate rationale for reaching that sentencing conclusion.

. This sentence from Ganim appears under the heading of "Hobbs Act Extortion,” but the Second Circuit seems to have been making a point about both that offense and § 666, and its discussion has been understood in those terms. See McNair, 605 F.3d at 1189-90; see also United States v. Rosen, 716 F.3d 691, 700 (2d Cir.2013) (applying Ganim to quid pro quo agreements under federal bribery and honest services fraud statutes).

. The juiy instructions clearly reflected this understanding of the quid-pro-quo requirement. See Aplt. App, at 181 (Jury Instrs,, dated Mar. 8, 2012) ("It need not be shown that any specific benefit was given in exchange for a specific official act.’’).

. Substantive-reasonableness review in the wake of the Supreme Court’s decision in United States v. Booker, 543 U.S. 220, 125 S.Ct, 738, 160 L.Ed.2d 621 (2005), is a challenging endeavor, to say the least. See, e.g.. Note, More than a Formality; The Case for Meaningful Substantive Reasonableness Review, 127 Harv. L. Rev. 951, 958 (2014) (“The workability of substantive reasonableness review has been the subject of withering criticism from the bench, the academy, and the Sentencing Commission itself.”),- Nevertheless, substantive-reasonableness review of sentencing decisions remains an important counterweight to balance the discretion of district courts. See id. at 964-70 (exploring "important functions that are diminished when courts treat it [i.e„ substantive-reasonableness review] as a rubber stamp”); id. at 972 ("[Resistance only reifies unwarranted disparities that the reasonableness standard was implemented to remedy.”). I endorse the remarks of one commentator who said:
[A]ppellate courts should consider the extent of a sentence’s deviation from the Guidelines (as permitted by Gall) and from *459 the sentences of similarly situated offenders; assess whether the district court’s reasoning is sound and whether the § 3553(a) factors emphasized by the district court can bear the weight assigned to them; and determine whether, in light of the totality of the circumstances, a sentence is shockingly high or low_ Courts should also recognize that remanding for resentencing is not a very costly remedy,- as sentencing hearings are • relatively short, discrete affairs.
Id. at 971. Suffice it to say, if we are to function as more than a "rubber stamp” we must endeavor to give meaning to the substantive component of our appellate review of sentencing decisions,

. The Second Circuit made an analogous point with respect to judicial corruption in the infamous Manton case. In United States v. Manton, 107 F.2d 834 (2d Cir.1939), the former Senior Circuit Judge of the United States Court of Appeals for the Second Circuit was convicted of conspiracy to obstruct the administration of justice and to defraud the United States. In part, the former judge challenged his conviction by arguing that the suspect decisions were legally sound. Writing for the panel, retired Supreme Court Justice George Sutherland explained:
[Tjhe unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago....
Id. at 846. This principle applies with equal force to any government action taken for unjust personal gain, regardless of whether the actor is a judge, a legislator, or any other public official. The relative merit of the proposed action is immaterial; the point is that government action is not for sale.

. In his extensive treatise on bribery, the Honorable John T. Noonan, Jr., Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, explored the occurrence, understanding, and effects of bribery from ancient times to the present-day United States. In his words,
[i]t is beyond debate that officials of the government are relied upon to act for the public interest not their own enrichment, When they take bribes they divide their loyalty. Whether or not they consciously act against the public interest, they have adopted a second criterion of action, the proper reciprocation of the bribe, Their resultant conflict of interest is always a dilution of loyalty, always a betrayal of trust____
The social injury inflicted by breaches of trust goes beyond any material measurement. When government officials act to enrich themselves they act against the fabric on which they depend, for what else does government rest upon except the expectation that those chosen to act for the public welfare will serve that welfare?
Noonan, supra, at 704.

. The majority ably makes a similar point, see, e.g., Maj. Op. at 445-46, and I fully agree with its analysis, insofar as it is consistent with the discussion herein.

. It is important to be clear about the broad berth that the district court has in scrutinizing the sentencing record. The government has in this appeal questioned the district court's reliance upon the character letters urging leniency for Mr. Morgan. To be sure, we ultimately conclude that the letters are not nearly enough to uphold this sentence on substantive-reasonableness review. However, for purposes of the impending resentencing proceedings, the district court should be aware that it has the discretion to consider Mr. Morgan’s letters of support as part of its *468 sentencing calculus. See, e.g., Warner, 792 F.3d at 857-59 (affirming the substantive reasonableness of a probationary sentence that was based in part on letters detailing the defendant's charitable works and generosity); Sayad, 589 F.3d at 1118-19 (affirming the substantive reasonableness of a probationary sentence that was based in part on "letters from [the defendant's] community"); Munoz-Nava, 524 F.3d at 1149 (affirming the substantive reasonableness of a one-year-and-one-day prison sentence that was based in part on the defendant's “many letters of support”).
The government's briefs could be read to suggest that a district court has less leeway in considering letters of support sent on behalf of a successful politician or other high-profile defendant than a court would have with more ordinary defendants. That is incorrect. The authority submitted by the government on this point does not limit a district court’s discretion in assessing letters as part of its sentencing determination. See Peppel, 707 F.3d at 640-42; United States v. Vrdolyak, 593 F.3d 676, 682 (7th Cir.2010); United States v. Vigil, 476 F.Supp.2d 1231, 1308-09 (D.N.M.2007), aff'd, 523 F.3d 1258 (10th Cir.2008). Rather, these cases stand for three commonsense propositions regarding how district courts should approach such letters.
The first lesson is that a district court should keep in mind the type of relationship a defendant has with the authors of character letters in weighing the letters’ import at sentencing, and should remember that successful figures might have, for various reasons, more supportive letters than others. See Vigil, 476 F.Supp.2d at 1308-09 ("[W]hen a successful politician stands before the Court on corruption charges, he or she can usually present evidence of many good qualities and can parade before the Court others who will attest to those qualities. This ability is often the reflection of what originally brought the defendant to prominence in public life. To place too much emphasis on those qualities would run the risk of not punishing people in public life for their crimes.”). Second, a district court should not place disproportionate reliance on such letters "while virtually ignoring the evidence that tugged the other way.” Vrdolyak, 593 F,3d at 682. And, third, a district court should not impose a more lenient sentence on a financially prosperous defendant on the ground that he can contribute more economically to the community. See Peppel, 707 F.3d at 640-42, On remand, in my view, the district court may again consider any letters of support for Mr. Morgan, so long as it does so in the balanced fashion required by caselaw, and so long as it does so while considering the other important sentencing concerns discussed herein.